# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

<table>
<tr><td>

**COALITION OF AMERICAN
MANUFACTURERS OF MOBILE
ACCESS EQUIPMENT,**

     **Plaintiff,**

  **v.**

**UNITED STATES,**

     **Defendant;**

  **and**

**ZHEJIANG DINGLI MACHINERY CO.,
LTD.,**

     **Defendant-Intervenor.**

</td><td>

**Before: Hon. M. Miller Baker,
Judge**

**Court No. 24-00219**

</td></tr>
</table>

## PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, the Coalition of American Manufacturers of Mobile Access Equipment ("Plaintiff") hereby moves for judgment on the agency record with respect to the determination of the U.S. Department of Commerce ("Commerce") in the 2022-2023 administrative review of the antidumping duty order on *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China. See Certain Mobile Access Equipment and Subassemblies Thereof From the People's*

Ct. No. 24-00219

*Republic of China*, 89 Fed. Reg. 88,730 (Dep't Commerce Nov. 8, 2024) (final results of antidumping duty admin. rev.; 2022-2023) and accompanying Issues and Decision Memorandum.

Plaintiff respectfully moves, for the reasons explained in the accompanying memorandum, that this Court find that agency findings, conclusions, and/or determinations with respect to this decision are not supported by substantial evidence or otherwise not in accordance with law. Plaintiff further moves that the Court remand this determination to Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Manufacturers of Mobile Access Equipment*

Dated: August 4, 2025

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| **COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,**<br><br>　　　　　**Plaintiff,**<br><br>　**v.**<br><br>**UNITED STATES,**<br><br>　　　　　**Defendant;**<br><br>　　**and**<br><br>**ZHEJIANG DINGLI MACHINERY CO., LTD.,**<br><br>　　　　　**Defendant-Intervenor.** | **Before: Hon. M. Miller Baker, Judge**<br><br>**Court No. 24-00219** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Manufacturers of Mobile Access Equipment*

**Dated:  August 4, 2025**

Ct. No. 24-00219                                         PUBLIC DOCUMENT

## TABLE OF CONTENTS

                                                                  PAGE

I.      Introduction ........................................................................ 1

II.     Statement Pursuant to Rule 56.2 ................................... 1

        A.     Administrative Determination Under Review ...... 1

        B.     Issues Presented for Review ................................... 2

III.    Statement of the Facts .................................................... 2

IV.     Argument .......................................................................... 7

        A.     Legal Standard ........................................................ 9

        B.     Commerce's Valuation of Certain Surrogate
               Values with Bulgarian, Rather Than Turkish,
               Data Is Not Supported by Substantial Evidence
               and Contrary to Law ............................................ 12

               1.     Motor Controllers ....................................... 13

               2.     Hot-Rolled and Cold-Rolled Steel Tubes ..... 20

               3.     Rectangular Steel Tube ............................... 24

        C.     Commerce's Selection of HTS Codes to Value
               Certain Surrogate Values Is Not Supported by
               Substantial Evidence and Is Contrary to Law ..... 27

               1.     Brakes .......................................................... 27

               2.     Steel Forearm Articles ................................ 31

               3.     Circuit Breakers .......................................... 34

V.      Conclusion ....................................................................... 39

Ct. No. 24-00219                                    PUBLIC DOCUMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Allied Pac. Food (Dalian) Co. v. United States,*
  30 CIT 736, 435 F. Supp. 2d 1295 (2006)....................................................19, 37

*Altx, Inc. v. United States,*
  25 CIT 1100, 167 F. Supp. 2d 1353 (2001)..................................................10, 33

*Bando Chem. Indus., Ltd. v. United States,*
  16 CIT 133, 787 F. Supp. 224 (1992).................................................................11

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962)...........................................................................................11

*Calgon Carbon Corp. v. United States,*
  145 F. Supp. 3d 1312 (Ct. Int'l Trade 2016) ......................................................9

*China First Pencil Co. v. United States,*
  34 CIT 1284, 721 F. Supp. 2d 1369 (2010).......................................................11

*Consol. Edison Corp. v. NLRB,*
  305 U.S. 197 (1938).............................................................................................9

*Dorbest Ltd. v. United States,*
  30 CIT 1671, 462 F. Supp. 2d 1262 (2006)..................................................11, 37

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015) .......................................................................7, 8

*Jacobi Carbons AB v. United States,*
  992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) ...................................................7, 8

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States,*
  322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ...............................................18, 19

*Juancheng Kangtai Chem. Co. v. United States,*
  No. 14-00056, 2015 WL 4999476 (Ct. Int'l Trade Aug. 21, 2015).............23, 24

Ct. No. 24-00219                                   PUBLIC DOCUMENT

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984) ..........................................................10

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut.
  Auto. Ins. Co.*,
  463 U.S. 29 (1983)..........................................................................11

*New Am. Keg v. United States*,
  No. 20-00008, 2021 WL 1206153 (Ct. Int'l Trade Mar. 23, 2021) .............10, 32

*OSI Pharms., LLC v. Apotex Inc.*,
  939 F.3d 1375 (Fed. Cir. 2019) .................................................23, 25

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
  44 F.3d 978 (Fed. Cir. 1994) ..........................................................10

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
  298 F.3d 1330 (Fed. Cir. 2002) ......................................................36

*Taian Ziyang Food Co. v. United States*,
  35 CIT 863, 783 F. Supp. 2d 1292 (2011)..........................................8

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)..........................................................................9

*Xiping Opeck Food Co. v. United States*,
  551 F. Supp. 3d 1339 (Ct. Int'l Trade 2021) ....................................18

*Yantai CMC Bearing Co. v. United States*,
  203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ....................................36

**Statutes**

18 U.S.C. § 1001 ................................................................................15, 16

19 U.S.C. § 1516a(b)(1)(B) ...................................................................9

19 U.S.C. § 1677b(c)(1)(B) ................................................................7, 8

**Regulations**

19 C.F.R. § 351.408(c)(2) ....................................................................7

iii

Ct. No. 24-00219                                    PUBLIC DOCUMENT

**Administrative Materials**

*Certain Mobile Access Equipment and Subassemblies Thereof From*
  *the People's Republic of China*,
  89 Fed. Reg. 88,730 (Dep't Commerce Nov. 8, 2024)................................. 1, 5-6

*Certain Mobile Access Equipment and Subassemblies Thereof From*
  *the People's Republic of China*,
  89 Fed. Reg. 35,067 (Dep't Commerce May 1, 2024) .........................................3

*Certain Mobile Access Equipment and Subassemblies Thereof from*
  *the People's Republic of China*,
  87 Fed. Reg. 22,190 (Dep't Commerce Apr. 14, 2022) .....................................27

*Initiation of Antidumping and Countervailing Duty Administrative*
  *Reviews*,
  88 Fed. Reg. 38,021 (Dep't Commerce June 12, 2023) ..............................2, 3, 4

Ct. No. 24-00219                                    PUBLIC DOCUMENT

# <u>GLOSSARY</u>

**Commerce**
U.S. Department of Commerce

**Dingli**
Zhejiang Dingli Machinery Co., Ltd.

**HS**
Harmonized System

**HTS**
Harmonized Tariff Schedule

**TARIC**
Integrated Tariff of the European Union

**Plaintiff or Petitioner**
Coalition of American Manufacturers of Mobile Access Equipment

## I.    INTRODUCTION

On behalf of the Coalition of American Manufacturers of Mobile Access Equipment ("Plaintiff" or "Petitioner"), we respectfully submit the following brief in support of Plaintiff's motion for judgment on the agency record.

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determination Under Review

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") final determination in the administrative review covering the period April 13, 2022, through March 31, 2023, of the antidumping duty order on *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*. The final results were issued on November 4, 2024, and published in the *Federal Register* on November 8, 2024. *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 88,730 (Dep't Commerce Nov. 8, 2024) (final results of antidumping duty admin. rev.; 2022-2023), P.R. 298, Appx___ ("Final Results") and accompanying Issues and Decision Memorandum, P.R. 294, Appx___ ("IDM").

PUBLIC DOCUMENT

### B.    Issues Presented for Review[1]

1.  Was Commerce's selection of Bulgarian data instead of Turkish
data to value surrogate values for certain of Zhejiang Dingli Machinery
Co., Ltd.'s ("Dingli") inputs supported by substantial evidence and
otherwise in accordance with law?

2.  Was Commerce's selection of data under certain Harmonized
Tariff Schedule ("HTS") codes, from among Turkish data, to value
surrogate values for certain of Dingli's inputs supported by substantial
evidence and otherwise in accordance with law?

## III.    STATEMENT OF THE FACTS

On June 12, 2023, Commerce published its notice of initiation of an
administrative review of the antidumping duty order on *Certain Mobile
Access Equipment and Subassemblies Thereof from the People's
Republic of China* for the period of review from April 13, 2022, to March
31, 2023. *Initiation of Antidumping and Countervailing Duty*

---

[1]    Plaintiff will not pursue certain arguments included in its
Complaint, and accordingly waives its allegations at Counts I, VII, VIII,
X, XI, and XII of its Complaint. *See* Compl. at 5–8 (Jan. 3, 2025), ECF
No. 8.

*Administrative Reviews*, 88 Fed. Reg. 38,021 (Dep't Commerce June 12, 2023), P.R. 6, Appx___.

Throughout the underlying administrative review, Commerce examined Dingli as the lone mandatory respondent and, ultimately, the only Chinese producer or exporter subject to this review. *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 35,067 (Dep't Commerce May 1, 2024) (prelim. results and partial rescission of antidumping duty admin. rev.; 2022-2023), P.R. 257, Appx___ ("Prelim Results") and accompanying Preliminary Decision Memorandum at 2–3, P.R. 249, Appx___ ("Prelim Decision Memo"). Dingli filed its initial questionnaire responses in August and September 2023. Prelim Decision Memo at 3, Appx___. Between October 2023 and March 2024, Dingli submitted supplemental questionnaire responses to Commerce. *Id.*, Appx___.

Consistent with its normal practice in antidumping duty proceedings concerning non-market economies, including China, Commerce's questionnaires requested information on the factors of production used in the production of the mobile access equipment merchandise under consideration. *See id.* at 2–3, 21–26, Appx___. Commerce also solicited

and collected information from interested parties, including Petitioner
and Dingli, regarding the selection of surrogate value data to be used to
value Dingli's factors of production. *See id.*, Appx\_\_\_.

Commerce issued its preliminary results on April 26, 2024, which
were published on May 1, 2024. Prelim Results at 35,067, Appx\_\_\_.
Commerce preliminarily selected Turkey as the primary surrogate
country from which to value Dingli's factors of production, and Bulgaria
as the secondary surrogate country because it found that "Bulgaria
provides the best data available for valuing certain key material inputs,
data that are not available in the {surrogate value} data from {Turkey}."
Prelim Decision Memo at 13, Appx\_\_\_. *See also* Letter from Dmitry
Vladimirov, Senior Int'l Trade Compliance Analyst, to the File, re:
*Administrative Review of the Antidumping Duty Order on Certain
Mobile Access Equipment and Subassemblies Thereof from the People's
Republic of China; 2022-2023: Preliminary Surrogate Values
Memorandum* (Apr. 25, 2024), Appx\_\_\_\_ ("Prelim SV Memo").
Commerce also identified certain inputs that it considered most
important in the production of mobile access equipment. *See* Prelim

Decision Memo at 9–11, Appx___. As relevant to this appeal, those inputs included the following:

- motor controllers (MOTOR_CONTROLLER);
- hot-rolled and cold-rolled steel tubes (ST_HCROLL_TUBE);
- rectangular steel tubes (ST_RECT_TUBE);
- brakes (BRAKE);
- forearm steel (FOREARM ST_ARTICLE); and
- circuit breakers (CIRCUIT_BREAKER).

*See id.* Commerce preliminarily relied on a combination of Bulgarian and Turkish import data provided by Dingli and Petitioner to value those inputs. *Id.*

Following the issuance of the preliminary results, the parties filed case and rebuttal briefs in June 2024. IDM at 2, Appx___. Petitioner's case brief identified a number of issues for Commerce to address in reaching its final results, including with regard to the at-issue inputs. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Case Brief* (June 5, 2024), P.R. 269, C.R. 237, Appx___ ("Petitioner's Case Br.").

As relevant to this appeal, Petitioner argued that Commerce had incorrectly valued certain inputs (namely, motor controllers, hot- and cold-rolled steel tubes, and rectangular steel tubes) with Bulgarian surrogate value data, which should have been valued with Turkish surrogate value data because the Turkish data were (i) equally or more specific to the inputs in question and (ii) from Commerce's primary surrogate country. *See id.* at 15–21, Appx___. Within the data set of Turkish surrogate value data, Petitioner also argued that Commerce had valued certain inputs (namely, brakes, forearm steel articles, and circuit breakers) using incorrect HTS codes because Commerce (i) failed to consider record evidence that the data provided by Petitioner were more specific to the inputs in question than those submitted by Dingli, and (ii) failed to fully or equally examine the surrogate value data on the record. *See id.* at 25–43, Appx___.

Commerce issued its final results on November 4, 2024, which were published on November 8, 2024. Final Results at 88,730, Appx___. The agency made various changes to its final calculations and responded to a number of the arguments raised in Petitioner's and Dingli's case and rebuttal briefs. *See* IDM at 46–71, Appx___. With respect to Dingli's

factors of production, however, Commerce rejected Petitioner's relevant arguments and declined to rely on the surrogate value data proposed by Petitioner for the inputs above. *See id.* at 46–53, Appx___ (Bulgarian versus Turkish values), 55–57, Appx___, 67–68, Appx___ (competing Turkish values). Because Commerce's determinations were contrary to the weight of record evidence, unreasonable, and/or inadequately explained, this appeal followed.

## IV.   ARGUMENT

When Commerce is reviewing imports from a non-market economy country, like China, it determines normal value "by valuing the 'factors of production' used in producing the merchandise in a comparable market economy to come up with 'surrogate values.'" *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015) (citing 19 U.S.C. § 1677b(c)(1)(B)). By regulation, Commerce "normally will value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2); *accord Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1376 (Ct. Int'l Trade 2014), *aff'd*, 619 F. App'x 992 (Fed. Cir. 2015) ("{A}lthough not absolute, the Department is directed by its regulations to endeavor to value all factors of production with a single

surrogate country.").  That preference "stems from the sensible
conclusion that deriving the surrogate data from one surrogate country
limits the amount of distortion introduced into the Department's
calculations . . . ." *Jacobi*, 992 F. Supp. 2d at 1376–77 (quotation and
alteration omitted).

  "The statute also directs Commerce to value the factors of production
'based on the best available information regarding the values of such
factors in a market economy country.'" *Downhole Pipe & Equip.*, 776
F.3d at 1375 (quoting 19 U.S.C. § 1677b(c)(1)(B)). In so doing—*i.e.*, in
choosing between values from Commerce's primary surrogate country
and a different country, or as between competing values from within the
primary surrogate country—Commerce considers whether the values
are "(1) publicly available, (2) contemporaneous with the {period of
review}; (3) representative of a broad market average; (4) tax and duty
exclusive; and (5) specific to the inputs being valued." IDM at 37,
Appx___. Although there is no formal hierarchy between these criteria,
"product specificity logically must be the primary consideration in
determining best available information.  If a set of data is not
sufficiently product specific, it is of no relevance whether or not the data

satisfy the other criteria." *Taian Ziyang Food Co. v. United States*, 35 CIT 863, 907, 783 F. Supp. 2d 1292, 1330 (2011) (quotations omitted). Where these criteria are "fairly equal" as between competing data, Commerce's preference for valuing factors of production from a single country "carries the day." *Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1326–27 (Ct. Int'l Trade 2016) (quotation omitted).

In the underlying review, as explained below, Petitioner provided Commerce with surrogate value data (i) from Commerce's primary surrogate country, (ii) that were equally or more specific to the inputs in question than competing data provided by Dingli. Because Commerce's reasons for nonetheless selecting Dingli's values were unsupported by substantial record evidence, unreasonable, and/or inadequately explained, its surrogate value determinations should be remanded.

A.  **Legal Standard**

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994). "{I}t is not enough for Commerce simply to 'determine' . . . that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion, and it is likewise not enough for Commerce to 'continue to find' something that is unsupported by a discussion of the evidence in the first instance." *New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *18 (Ct. Int'l Trade Mar. 23, 2021). Thus, although Commerce need not address every single piece of evidence, "it must address significant arguments and evidence which seriously

undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 25 CIT 1100, 1117, 167 F. Supp. 2d 1353, 1374 (2001).

The Court must determine whether the evidence and reasonable inferences from the record support the agency's findings. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Careful scrutiny of surrogate value choices is particularly important because "{i}f the proxy values selected prove unrepresentative, reliance on them defeats their purpose, namely, to derive a dumping margin that is as accurate as possible." *Dorbest Ltd. v. United States*, 30 CIT 1671, 1677, 462 F. Supp. 2d 1262, 1269 (2006).

Finally, Commerce "may not act arbitrarily in reaching its decision." *China First Pencil Co. v. United States*, 34 CIT 1284, 1289, 721 F. Supp. 2d 1369, 1375 (2010). Its determinations "must have a reviewable, reasoned basis" to be affirmed. *Bando Chem. Indus., Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992), *aff'd*, 26 F.3d 139 (Fed. Cir. 1994). To that end, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

### B.   Commerce's Valuation of Certain Surrogate Values with Bulgarian, Rather Than Turkish, Data Is Not Supported by Substantial Evidence and Contrary to Law

With regard to three surrogate value inputs, Commerce erroneously determined that data under Dingli's Bulgarian HTS selections, as opposed to Petitioner's Turkish HTS selections, were the best available information for purposes of valuing Dingli's factors of production:

- motor controllers (MOTOR_CONTROLLER);

- hot-rolled and cold-rolled steel tube (ST_HCROLL_TUBE); and

- rectangular steel tubes (ST_RECT_TUBE).

In each case, Petitioner identified 12-digit Turkish HTS data that were specific to the input in question, whereas Dingli identified more general, 6- or 8-digit Bulgarian HTS codes.[2] *See* Petitioner's Case Brief

---

[2]    Plaintiff notes that the underlying administrative record refers variably to Harmonized Tariff Schedule ("HTS") and Harmonized System ("HS") categories. HS codes are universal, as they are the same for each country through the 6-digit level.  Individual country HTS codes may differ (or be the same) when expanded to the 8-, 10-, or 12-digit levels.  As discussed further below, Turkey and Bulgaria subscribe to a common

at 17, Appx___ (comparison chart). Despite its selection of Turkey as the primary surrogate country, and the equal or greater specificity of the Turkish values as to each input, Commerce rejected Petitioner's proffered data. *See* IDM at 6 and Comment 11, Appx___. For the reasons below, Commerce's findings were unsupported by substantial evidence and not in accordance with law.

## 1.   **Motor Controllers**

In its Preliminary Results, Commerce considered competing HTS subheadings from Petitioner and Dingli to value motor controller inputs.  *See* Prelim SV Memo at 10–11, Appx___. Dingli proposed an 8-digit Bulgarian HTS code (8538.90.91) that covers "electronic assemblies for electrical apparatus." *Id.*  Petitioner proposed a 12-digit Turkish HTS code (8538.90.91.00.00) that covers "parts for electrical apparatus for electrical circuits, boards, panels etc. for electric control or distribution of electricity, {not elsewhere specified or included}: other assembled electronic components and parts." *Id.* (capitalizations omitted). Petitioner explained that because Turkey and Bulgaria each

_____

classification system and thus share HTS categorizations to at least the 8-digit level.

subscribe to the Integrated Tariff of the European Union ("TARIC")

system, HTS subheadings between the two countries are identical to the

8-digit level. *See* IDM at 48, Appx\_\_\_ (citing Petitioner's Case Brief at

18–19, Appx\_\_\_). Petitioner also explained that, consistent with any

tariff classification system, a code ending in "00.00" represents a

subheading that does not get any more specific. *Id.* Thus, the Turkish

and Bulgarian subheadings under consideration were, in this case, the

same, depriving Commerce of any reason not to select data from the

primary surrogate country.

Dingli argued in opposition that (i) the record was unclear as to

whether 8538.90.91.00.00 is the only 12-digit breakout corresponding to

Turkish parent code 8538.90.91, (ii) the parties' proffered codes could

not be identical because their narrative descriptions were not the same,

and (iii) the description of the Bulgarian code best corresponded with

Dingli's motor controllers based on their end use. *Id.* at 48–49, Appx\_\_\_.

Commerce agreed with Dingli across the board. *Id.* at 49, Appx\_\_\_.

*First*, Commerce agreed that "there is no record evidence showing

that Turkish HS 8538.90.91 contains only one 12-digit breakout, *i.e.*,

HS 8538.90.91.0000." *Id.* But that conclusion was demonstrably

incorrect. Petitioner expressly represented to Commerce that it had placed on the record "Turkish import data for <u>all</u> HS subheadings proposed by Dingli at the six-digit level as well as <u>every</u> HS subheading at the 12-digit level comprising the six-digit heading." Letter from Wiley Rein LLP, to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Comments in Advance of the Preliminary Results Regarding Dingli* (Apr. 11, 2024) at 20, P.R. 26, Appx___ ("Petitioner Comments in Advance of Preliminary Results") (emphasis added). Pursuant to 18 U.S.C. § 1001, which subjects parties to criminal penalties for knowingly making material false statements to the U.S. Government, that representation was presumptively true. Indeed, a subheading ending in "0000" universally indicates the absence of further breakout codes.[3] In other

---

[3]    This is supported by the Turkish data placed on the record by Petitioner, which illustrates that every 12-digit HTS subheading ending in "0000" was the only 12-digit breakout under the parent 8-digit HTS subheading. The sole exception was for Turkish HTS 2710.19.21, which broke out into 2710.19.21.0000 and 2710.19.21.0019, corresponding with a temporal divide: data for 2710.19.21.0000 ends in December 2020, and data for 2710.19.21.0019 begins in January 2023, confirming the two breakouts did not exist contemporaneously. *See* Letter from Wiley Rein LLP, to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final*

words, a 12-digit HS breakout only ends in 0000 when there are no other 12-digit breakouts for that HTS subheading in effect at the time. Accordingly, Commerce's determination that there was "no record evidence" that it had the full universe of available Turkish codes, IDM at 49, Appx___, was incorrect and contrary to the weight of record evidence.

*Second*, Commerce agreed with Dingli that the "differing descriptions for competing HS categories" undermined Petitioner's assertion that the Bulgarian and Turkish codes under consideration were in fact the same. IDM at 49, Appx___. But in reaching that one-sentence conclusion, Commerce failed to address—much less adequately explain its decision to reject—unrebutted record evidence that these TARIC system subheadings are definitionally equivalent.

As noted above, and as confirmed by Dingli's own submissions, the European Union uses a harmonized tariff nomenclature called "TARIC" which is common to all member states, including Bulgaria. *See* Letter from Grunfeld, Desiderio, Lebowitz, Silverman, and Klestadt LLP, to

---

*Rebuttal Submission of Surrogate Values* (Mar. 27, 2024), P.R. 213–220 at Exhibit 3-F, Appx___.

Sec'y Commerce, re: *Dingli's Revised Final SV Rebuttal Comments First Administrative Review of Antidumping Duty Order of Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* at Attachment Exhibits 2–3 (Apr. 15, 2024), P.R. 244–247, Appx___. As a result of a Customs Union between Turkey and the European Community, Turkey follows the TARIC system as well. *Id.* at Attachment page 2 and Exhibit 1, Appx___. "The TARIC system uses a 10-digit TARIC code which builds upon the international harmonised system and the combined nomenclature, but which incorporates a unique 2-digit TARIC component as well (in some instances, a further four digits may be included in the code for more exact differentiations between products)." *Id.* at Attachment Exhibit 3, Appx___. In other words, the first six digits of a TARIC subheading are the HS, the next two digits are the combined nomenclature, and the last two digits are the TARIC nomenclature, for a total of 10 digits. Turkish customs nomenclature is therefore identical to Bulgaria's down to at least the 8-digit level and likely to the 10-digit level.  Given their language differences, it is not unexpected that the two countries may

translate subheadings differently. This does not alter the fact that the tariff codes cover the same merchandise.

*Third*, Commerce agreed with Dingli that its "motor controller is a small electronic part that is used as a component of a large and sophisticated control panel or board, making the coverage thereof specific under HS subheading 8538.90.91, while suspect under HS subheading 8538.90.91.0000 ('other assembled electronic components and parties.')." IDM at 49, Appx___. But that finding rests on the same erroneous and unsupported conclusion that the parties' proposed HTS subheadings cover different merchandise simply because one goes to the 12-digit level and their narrative descriptions differ. It is well-established—and at least bore consideration by Commerce—that this is not how harmonized tariff systems work, including TARIC specifically. *See, e.g.*, *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F. Supp. 3d 1308, 1320 (Ct. Int'l Trade 2018) ("The two headings at issue are internationally harmonized, i.e., the relative scope of each is determined according to the tariff classification rules and principles of the international Harmonized Commodity Description and Coding System . . . .  Because Thailand (like the United States and, essentially,

all of its trading partners) is a member of the Harmonized System
Convention, the Thai HTS is structured according to the nomenclature
of the HS to the six-digit level."); *see also Xiping Opeck Food Co. v.
United States*, 551 F. Supp. 3d 1339, 1342 (Ct. Int'l Trade 2021)
("'TARIC' is a customs classification system akin to the Harmonized
Tariff Schedule of the United States.  The TARIC system is organized in
a hierarchical structure by sections, chapters, headings, and
subheadings, and is based upon the international Harmonized
Commodity Description and Coding System administered by the World
Customs Organization.").

Because Commerce's determination to use Dingli's Bulgarian
surrogate values failed even to acknowledge that (i) TARIC codes are
harmonized and thus identical to at least the 8-digit level, (ii) HTS
subheadings ending in "0000" indicate that a parent code does not get
any more specific, and (iii) Petitioner expressly represented that there
were no further 12-digit codes that could apply, that determination was
unsupported by substantial evidence and, at minimum, inadequately
explained.  *See, e.g.*, *Jiangsu*, 322 F. Supp. 3d at 1319 (Ct. Int'l Trade
2018) (remanding surrogate value determination: "Because the

Coalition made its argument . . . in its case brief filed before Commerce . . . ., and because the data supporting this argument potentially would detract from the Department's finding . . . , Commerce was obligated to address this argument in its final determination." (citation omitted)); *Allied Pac. Food (Dalian) Co. v. United States*, 30 CIT 736, 766, 435 F. Supp. 2d 1295, 1320–21 (2006) (remanding determination unsupported by substantial evidence and that merely paraphrased party argument: "The Department's explanation of why the ACC is not a reliable source does not appear to be based on record evidence. . . . From the Department's characterization of the petitioner's argument and the subsequent statement that Commerce agrees with the petitioner on that point, the court is informed of nothing beyond the Department's conclusory adoption of the petitioner's position . . . .").

### 2.   <u>Hot-Rolled and Cold-Rolled Steel Tubes</u>

Commerce also considered competing HTS subheadings for the hot-rolled and cold-rolled steel tube surrogate values, as to which Dingli proposed Bulgarian HTS 7304.39.82 and Petitioner proposed Turkish HTS 7304.39.82.9000. *See* IDM at 49–50, Appx___. In its Preliminary Results, Commerce recognized that both proposed categories "cover

seamless iron or non-alloy steel hot-rolled tubes, pipes and hollow profiles of circular cross-section with an outside diameter less than 168.3mm." *Id.* (quoting Prelim SV Memo at 11, Appx___). But it preliminarily determined that it was "not clear" whether the Turkish HTS category "achieves further specificity to the input in question." *Id.* Thus, Commerce again selected the Bulgarian data despite the fact that it was not from the primary surrogate country, and in this case was also overbroad. *Id.*

In its case brief, Petitioner explained that only two HTS subheadings exist in Turkey under HTS 7304.39.82, the corollary to the 8-digit Bulgarian HTS code that Dingli proposed: (1) HTS 7304.39.82.1000, which covers tube for use in civil aircraft and (2) HTS 7304.39.82.9000, which covers tube not for use in civil aircraft. *Id.* (citing Petitioner's Case Brief at 19, Appx___). Because mobile access equipment undisputedly is not civil aircraft, Petitioner explained that only the latter HTS subheading could apply, rendering it more specific than Dingli's parent code, which would necessarily encompass both aircraft and other tube. *Id.*

Mirroring its argument with regard to motor controllers, Dingli argued that Petitioner had "fail{ed} to demonstrate that under Turkish HS 7304.39.82, there are only two 12-digit breakouts." *Id*. at 50, Appx___, (citing Dingli Rebuttal Br. at 18, Appx___).  As a result, Dingli speculated that it was "conceivable that Turkish HS subheading 7304.39.82 may likely contain an additional 12-digit breakout that is specific to the input, in which case the residual Turkish HS subheading 7304.39.82.9000 will be rendered as a broad basket category without including the input." *Id*. (emphases added). Commerce agreed. *Id*.

*First*, Commerce found again that there was "no record evidence" that the two 12-digit breakouts provided by Petitioner were the only ones corresponding with the parent Turkish subheading. *Id*. But for the reasons above, that finding again was incorrect: Petitioner affirmatively represented that it had placed on the record "every HS subheading at the 12-digit level" under the Turkish system. Petitioner Comments in Advance of Preliminary Results at 20, Appx___ (emphasis added). Thus, considering TARIC system equivalents, the two Turkish codes on the record were fully equivalent to the Bulgarian parent code that Commerce selected, but with added specificity: one broke out irrelevant

**PUBLIC DOCUMENT**

tube for use in aircraft from tube usable for mobile access equipment and thus relevant here. *See id.*

*Second*, based on the false premise that other 12-digit Turkish codes <u>might</u> exist, Commerce speculated that, "{b}ecause it is not known whether Turkish HS subheading 7304.39.82 <u>may</u> contain an additional 12-digit breakout that is specific to the input, the petitioner's proposed residual Turkish HS subheading 7304.39.82.9000 <u>may not</u>, thus, be specific to the input." IDM at 50, Appx___ (emphasis added). That finding is likewise incorrect and unsupported by substantial evidence for the reasons above. It also fails for the additional reason that speculation about what <u>may</u> lie beyond the record is neither a relevant consideration nor adequate reasoning for purposes of substantial-evidence review. *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("Mere speculation is not substantial evidence." (quotation omitted)); *see also Juancheng Kangtai Chem. Co. v. United States*, No. 14-00056, 2015 WL 4999476, at *31 (Ct. Int'l Trade Aug. 21, 2015) ("Commerce's surrogate value determination is based upon the best available information <u>on the record</u> of each review." (emphasis added)).

In short, record evidence demonstrated that Dingli's 8-digit Bulgarian code was at least equivalent to the two 12-digit Turkish codes on the record, and inferior to (*i.e.*, less specific than) the 12-digit Turkish code proposed by Petitioner that excluded irrelevant aircraft tube. Because Commerce's determination to value this input using Bulgarian data rested solely on inaccurate and unreasonable speculation about what other Turkish codes might exist (there were none), it should be remanded.

### 3.   Rectangular Steel Tube

Commerce's selection of Bulgarian data to value Dingli's rectangular steel tube inputs should be remanded for the same reasons.  In its Final Results, Commerce selected Bulgarian HTS subheading 7306.61.99 over the more specific, corresponding Turkish HTS subheading 7306.61.99.9000.  IDM at 52–53, Appx___.  As with hot-rolled and cold-rolled steel tubes, discussed above, Petitioner explained that Turkish HTS subheading 7306.61.99 breaks out into just two 12-digit codes: one for use in civil aircraft (7306.61.99.10.00) and one for other tubes (7306.61.99.9000).  *Id*. at 53, Appx___ (citing Petitioner's Case Brief at 21–22, Appx___).  Because mobile access equipment still is not civil

aircraft, Petitioner explained that only the latter could apply. Petitioner's Case Brief at 21-22, Appx___.

Dingli again argued, and Commerce again agreed, that there is "no evidence that only two Turkish 12-digit breakouts . . . comprise parent HS subheading 7306.61.99." IDM at 53, Appx___. As a result, Dingli again speculated, and Commerce again agreed, that "{b}ecause it is not known whether Turkish HS 7306.61.99 <u>may</u> contain an additional subheading 12-digit breakout that is specific to the input, the petitioner's proposed residual Turkish HS 7306.61.99.90.00 <u>may</u> not, thus, be specific to the input." *Id.* (emphasis added). On that basis alone, Commerce relied on Dingli's proposed Bulgarian data.

For the reasons explained above, Commerce's premise—that there is "no record evidence" the Turkish parent subheading corresponding to Dingli's Bulgarian subheading contains only two breakout codes, *id.*—is demonstrably false, as Petitioner informed Commerce that it had placed all Turkish 12-digit subheadings on the administrative record. Commerce's resulting speculation that some other Turkish code, not on the record, <u>might</u> be more specific to Dingli's rectangular steel tube is

thus unreasonable and unsupported by substantial evidence itself.  *See*

*OSI Pharms*, 939 F.3d at 1382.

*          *          *

In short, as to each input above, the record contained HTS codes

from Turkey (the primary surrogate country), which were at least as

specific as the more generic Bulgarian codes that Commerce ultimately

selected.  Commerce's determination not to use those Turkish codes was

based on an unsupported conclusion that other breakout codes <u>might</u>

exist, and speculation that such codes <u>might</u> be more specific than codes

on the record.  In reaching those determinations, Commerce failed to

address Petitioner's representation that all 12-digit Turkish codes were

in fact on the record and the well-documented comparability between

Turkish and Bulgarian codes to at least the 8-digit level.  As a result,

Commerce selected surrogate value inputs that were (i) not from its

primary surrogate country and (ii) equally or less specific than the

corresponding Turkish codes—contrary to agency practice and

regulations.  Because Commerce's determinations were unsupported by

substantial evidence, unreasonable, and inadequately explained, they

should be remanded.

### C.     <u>Commerce's Selection of HTS Codes to Value Certain Surrogate Values Is Not Supported by Substantial Evidence and Is Contrary to Law</u>

Similar errors occurred with regard to Commerce's selection of certain HTS codes from within the Turkish data set, related to surrogate values for:

- brakes (BRAKE);

- steel forearm articles (FOREARM ST_ARTICLE); and

- circuit breakers (CIRCUIT_BREAKER).

In each case, Petitioner again identified 12-digit Turkish HTS data that were specific to the input in question, whereas Dingli identified more general, 6-digit Turkish HTS codes. For the reasons below, Commerce's findings as to these three inputs were similarly unsupported by substantial evidence and not in accordance with law.

#### 1.    <u>Brakes</u>

In its Preliminary Results, Commerce valued Dingli's brakes input using Turkish HTS subheading 8708.30, which covers "Brakes And Servo-Brakes; Parts Thereof," and rejected Petitioner's suggestion of 8708.30.10.0000, covering "Brakes And Servo-Brakes; Parts Thereof: Brakes and Servo Brakes and Parts of Motor Vehicles, Tractors, and

Motor Cultivators for Special Purpose, Carrying Goods, and Carrying People." IDM at 55, Appx___. Commerce reasoned that it was "not clear whether a more segregated {HTS} category . . . achieves further specificity to the input in question, merely because it is confined to vehicles suitable for agricultural use, as opposed to other vehicles, in general." *Id.* at 55–56, Appx___ (quoting Prelim SV Memo).

Petitioner's case brief explained that Commerce had failed to consider certain material facts. In particular, Dingli's proposed 6-digit code broke out into five 12-digit subheadings—only one of which could possibly apply under the scope of the underlying *Order*. *See* Petitioner's Case Brief at 26, Appx___. According to the scope, mobile access equipment is properly classified under heading 8427. *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 87 Fed. Reg. 22,190, 22,193 (Dep't Commerce Apr. 14, 2022) (antidumping duty order). But four of the five subheadings under Commerce's selected code related to facially inapplicable (*i.e.*, non-8427) headings. *See* Petitioner's Case Brief at 26, Appx___. In particular, those four subheadings are specific to brakes and brake parts for motor vehicles classified under HTS headings 8701 to 8705

(*e.g.*, motor vehicles for the transport of ten or more persons, classified under 8702) (*i.e.*, not mobile access equipment). *Id.* Thus, if brakes are properly classified under HS 8708.30—as Dingli argued and Commerce agreed—Petitioner's proffered subheading was the only breakout from Dingli's more general code that could apply. *Id.* Petitioner further noted that brakes and parts for "Special Purpose, Carrying Goods, and Carrying People" are in no way limited to agricultural use. *Id.* at 26–27, Appx___.

Dingli argued in opposition that (1) "absent record evidence establishing that HS 8707.30 contains only five 12-digit breakouts, as the petitioner claims, there <u>potentially</u> could be another 12-digit HS subheading that more specifically covers the input," and (2) "there is no evidence" that mobile access equipment would constitute "special purpose vehicles carrying goods and people." IDM at 56, Appx___ (emphasis added). In its Final Results, Commerce agreed with Dingli.

*First*, as it did in relation to the inputs discussed above, Commerce found again that there was "no record evidence that five Turkish 12-digit breakouts comprise parent HS 8708.30." *Id.* On that erroneous basis, Commerce concluded that Petitioner's proposed subheading "<u>may</u>

not, thus, be specific to the input" and that it was therefore "speculative" to conclude that only Petitioner's subheading—of the five subheadings under Commerce's more general selection—could apply. *Id.* (emphasis added). Again, Commerce's factual premise was incorrect because all Turkish 12-digit subheadings were on the record. Speculation as to what other subheadings, not on the record, might have encompassed was thus unsupported by substantial record evidence.

*Second*, in one sentence and without explanation, Commerce stated that it is "speculative for the petitioner to assume that . . . subheading 8708.30.10.00.00 necessarily covers said parts for motor vehicles classified under heading 8427 (for MAE)." *Id.* at 56, Appx___. But Commerce did not address the "verbiage of HS 8708.30.10.00.00," which easily encompasses mobile access equipment on its face. *Compare id.* at 55–56, Appx___ (discussing brakes for motor vehicles used "for special purpose, carrying goods, and carrying people" (capitalizations omitted), *with Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 87 Fed. Reg. at 22,193 (defining mobile access equipment as merchandise consisting of a mobile chassis with a

lifting device "for mechanically lifting persons, tools and/or materials" and other components).  Nor did Commerce correct its prior unsupported and arbitrary reading of the 12-digit subheading as applying to agricultural vehicles alone.  Instead, Commerce simply continued to find that Dingli's proffered subheading was "sufficiently specific."  IDM at 56, Appx___.

Because Commerce dismissed subheading 8708.30.10.00.00 based on factual error, and inadequately explained its resulting determination that a 6-digit parent code encompassing four facially irrelevant subheadings was the best information available, its determination should be remanded.

### 2.   Steel Forearm Articles

Commerce's determination to use a 6-digit subheading to value Dingli's steel forearm articles, in lieu of Petitioner's proffered 12-digit breakout, should be remanded for similar reasons.  Petitioner and Dingli agree that 6-digit subheading 7326.90 should apply to the input in question.  *See* Petitioner's Case Brief at 27, Appx___.  But Petitioner demonstrated in its case brief that, of all the 12-digit breakouts under that subheading, only one could apply: 7326.90.98.0019.  *See id.* at 27–

28, Appx\_\_\_ (three breakouts covered forged or sintered articles of iron or steel, while the steel forearm article is cut from steel plate), *id.* at 27–28, Appx\_\_\_ (remaining breakouts covered facially inapplicable goods like ladders, pallets, roof gutters, handcuffs, etc.); *see also* Prelim SV Memo at 15, Appx\_\_\_ (noting Dingli's input is "made from plate" and rejecting breakout covering "forged" articles).  Dingli's proffered 6-digit code was thus necessarily overbroad because it included numerous facially inapplicable breakouts, whereas Petitioner's 12-digit code was both applicable and more specific.

In opposition, Dingli argued again that "there is no record evidence establishing that Turkish HS 7326.90 contains only the specific 12-digit breakouts that the petitioner placed on the record," and "as such, there potentially could be another 12-digit HS subheading that more specifically covers the input."  IDM at 57, Appx\_\_\_.  Commerce agreed. *See id.* ("Commerce agrees with Dingli.  There is no record evidence that certain 12-digit breakouts under HS 8708.30 that the petitioner placed on the record comprise the entire universe of the 12-digit breakouts for HS 732690.").  Based on erroneous speculation that "HS 732690 <u>may</u> contain an additional 12-digit breakout, not provided on the record, that

is specific to the input," Commerce further speculated that Petitioner's proffered breakout "<u>may</u> entirely remove Dingli's input from being encompassed" by the proffered code.  *Id.* (emphasis added). Accordingly, Commerce continued to rely on the more general—and facially overbroad—subheading proposed by Dingli.  *See id.*

Once again, Commerce's premise and resulting speculation are demonstrably incorrect.  In its case brief discussion of the steel forearm article input specifically, Petitioner reiterated that it had "placed the available Turkish import data for <u>all</u> 12-digit subheadings falling under HTS 7326.90 on the record of this review."  *See* Petitioner's Case Brief at 27, Appx___ (emphasis added).  Commerce's failure to address that record fact, and conclusions to the contrary, are thus unsupported by substantial evidence and inadequately explained.  *See New Am. Keg*, 2021 WL 1206153, at *18 ("{I}t is not enough for Commerce simply to 'determine' . . . that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion . . . ."); *Altx*, 25 CIT at 1117, 167 F. Supp. 2d at 1374 ("{Commerce} must address significant arguments and evidence which seriously undermines its reasoning and conclusions.").  Its

determination to rely on HS 7326.90 to value Dingli's steel forearm articles should be remanded.

### 3.    Circuit Breakers

Commerce's circuit breaker determination was also unreasonable and unsupported. In its Preliminary Results, Commerce valued Dingli's circuit breaker input with subheading 8536.20, covering "Automatic Circuit Breakers For A Voltage Not Exceeding 1,000 V." IDM at 67, Appx___. Petitioner demonstrated that subheading 8536.20.10.0019 was more specific to the input in question for a number of reasons. Subheading 8536.20 divides into breakouts (1) for "household miniature" circuit breakers versus other circuit breakers, and (2) depending on the rating of the circuit breaker. Petitioner's Case Brief at 39, Appx___. Because mobile access equipment refers (in simplified terms) to hydraulic, industrial lifts "capable of reaching a working height of ten feet or more," *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 87 Fed. Reg. at 22,192, subheadings covering "household" miniature circuit breakers do not apply, Petitioner's Case Brief at 39, Appx___.

Of the two remaining subheadings, one covers circuit breakers below 63 amps and the other covers circuit breakers rated at 63 amps or above. *Id.* at 40, Appx___. Dingli described its circuit breaker input as "Circuit breaker - 20A, 125/220V." Letter from Grunfeld, Desiderio, Lebowitz, Silverman, & Klestadt, LLP to Sec'y Commerce, re: *Dingli's Response to Second Supplemental Questionnaire in the First Administrative Review of Antidumping Duty Order of Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* (Jan. 18, 2024) at Exhibit S2D-A, P.R. 153–156, C.R. 174–197, Appx___. That is, Dingli reported its circuit breakers as being rated for 20 amps and 125/220 volts. *Id.* Since Dingli's circuit breakers are rated for 20 amps, and thus below 63 amps, subheading 8536.20.10.0019 related to non-household circuit breakers below 63 amps was the best information available on this record. *Id.*

Dingli did not identify contrary record evidence in opposition. Instead, it argued that household circuit breakers could be "comparable to the input" for mobile access equipment, because they "perform identical function{s} as the input, albeit in a different setting." IDM at 67–68, Appx___. And Dingli argued (after the deadline for submission

of new factual information) that, "absent evidence to the contrary, Dingli's circuit breakers straddle both sides of the 63 amperage mark," contrary to the record evidence. Dingli continued that, "{t}herefore, the above 63 amps sub-heading should not be excluded from the valuation." Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Sec'y of Commerce, re: *Dingli's Rebuttal Brief in the First Administrative Review of Antidumping Duty Order on Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* (June 17, 2024) at 43, P.R. 274, C.R. 238–239, Appx___.  Commerce agreed with Dingli.

*First*, Commerce stated "it is not clear from the description of HS 8536.20 breakout categories what is mean{t} by 'household miniature' or 'other,'" adding that "the petitioner does not identify anything in the record that establishes incomparability of Dingli's circuit breaker to the 'household miniature' one . . . ."  IDM at 68, Appx___ (emphasis added). *Second*, Commerce concluded "there is no record evidence to determine whether Dingli's circuit breaker should be rated above or below 63 amps." *Id.*  Thus, Commerce determined to continue using the general 6-digit subheading encompassing facially irrelevant breakout codes. *Id.*

Commerce's assertions and determination were unreasonable on their face. Mobile access equipment are neither houses nor household items. And asking Petitioner to prove as much—about Dingli's inputs—impermissibly shifts the burden of production from Dingli to Petitioner. *See, e.g.*, *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) ("The burden of production belongs to the party in possession of the necessary information." (citation and alterations omitted)); *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1324 (Ct. Int'l Trade 2017) ("Commerce's role in an administrative proceeding is to weigh the evidence established in the record. It is the respondent's burden to create the record." (citation omitted)). Further, Commerce ignored the fact that Dingli reported its circuit breakers as being rated to 20 amps.

Commerce's reasoning also amounted to an arbitrary double standard, whereby Commerce credited (1) Dingli's unsupported assertion that its circuit breakers <u>could be</u> similar to household circuit breakers (with no evidence to that effect) over Petitioner's facially reasonable deduction that they are not, and (2) Dingli's specious assertion that its certain breakers <u>could be</u> rated above or below 63

amps, despite record evidence demonstrating that its circuit breakers are rated to 20 amps. *Cf. Dorbest*, 30 CIT at 1693, 462 F. Supp. 2d at 1282 ("It appears inconsistent for Commerce to require specificity for one data set, while allowing for a broader data set that has no indication either as to whether it includes mirrors with 'beveling' or etching, as is the case with MSFTI."); *Allied Pac. Food (Dalian)*, 30 CIT at 758, 435 F. Supp. 2d at 1314 ("Commerce discredited the various forms of surrogate value information that plaintiffs submitted, identifying what it considered to be deficiencies, without explaining adequately how the Nekkanti financial statement data that petitioner submitted, and Commerce accepted for use, were superior to these alternative sets of data according to the Department's own criteria.").

Because Commerce selected a facially overbroad surrogate value, based on inconsistent and unsupported reasoning, its determination should be remanded.

## V.   CONCLUSION

For the foregoing reasons, we respectfully request that the Court remand the final determination in the underlying administrative review to Commerce consistent with the arguments made in this brief.

Respectfully submitted,

/s/ Timothy C. Brightbill
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

Counsel for the Coalition of American Manufacturers of Mobile Access Equipment

Dated:  August 4, 2025

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Memorandum in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,023 words.


<u>*/s/ Timothy C. Brightbill*</u>
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

<u>*Coalition of American Manufacturers*</u>
<u>*of Mobile Access Equipment*</u>
(Representative Of)

<u>August 4, 2025</u>
(Date)