UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERES OF MOBILE ACCESS EQUIPMENT, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ZHEJIANG DINGLI MACHINERY CO., LTD., <br><br> Defendant-Intervenor. | Court No. 24-00219 |
| ZHEJIANG DINGLI MACHINERY CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> and <br><br> COALITION OF AMERICAN MANUFACTURERES OF MOBILE ACCESS EQUIPMENT, <br><br> Defendant-Intervenor. | Court No. 24-00221 |

**DEFENDANT'S RESPONSE TO CONSOLDIATED PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE <u>AGENCY RECORD</u>**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY .......................................................................................vii

STATEMENT PURSUANT TO RULE 56.2 ............................................2

    I.    The Administrative Determination Under Review...............2

    II.   Issues Presented for Review ............................................... 2

STATEMENT OF FACTS .................................................................... 3

SUMMARY OF THE ARGUMENT ...................................................... 16

ARGUMENT ..................................................................................... 19

    I.    Standard Of Review ......................................................... 19

    II.   Commerce's Selection of Türkiye as the Primary
           Surrogate Country Is Supported by Substantial
           Evidence and in Accordance with Law ................................20

          A.   Legal Framework and Commerce's Methodology .......21

          B.   Commerce Reasonably Found No Record
               Evidence That the Turkish Import Average Unit
               Values Were Distorted by Hyperinflation...................27

          C.   Commerce Reasonably Relied on Turkish
               Financial Statements and Explained Why They
               Were Usable ................................................................ 31

    III.  Commerce's Valuation of Certain Surrogate Values
           with Bulgarian, Rather Than Turkish, Data is
           Supported by Substantial Evidence and Otherwise in
           Accordance with Law ........................................................ 36

    IV.  Commerce's Selection of Broader HTS Codes to Value
           Certain Surrogate Values is Supported by Substantial
           Evidence and Otherwise in Accordance with The Law........48

V.    Dingli Lacks Standing To Challenge Commerce's
      Differential Pricing Methodology ........................................55

VI.   Commerce's Deduction of Section 301 Duties as U.S.
      duties from Dingli's U.S. Price is Supported by
      Substantial Evidence and in Accordance with Law ............60

# TABLE OF AUTHORITIES

Page(s)

Cases

*APEX Exps. v. United States*,
  777 F.3d 1373 (Fed. Cir. 2015) ............................................................ 64

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ............................................................ 20

*Best Mattresses Int'l Co. Ltd. v. United States*,
  622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ................................. 56, 59

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S.v. United States*,
  63 F.4th 25 (Fed. Cir. 2023) ......................................................... passim

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ............................................................................. 20

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ...................................................................... passim

*Dorbest LTD v. United States*,
  462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ..................... 41, 44, 47, 48

*Downhole Pipe & Equip., L.P. v. United States*,
  776 F.3d 1369 (Fed. Cir. 2015) ...................................................... 41, 42

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ............................................................................. 56

*Goldlink Indus. Co. v. United States*,
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ....................................... 20

*Guangdong Chems. Imp. & Exp. Corp. v. United States*,
  460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006) ..................... 41, 44, 47, 48

*Home Meridian Int'l, Inc. v. United States*,
  772 F.3d 1289 (Fed. Cir. 2014) .................................................... passim

*Jiaxing Bro. Fastener Co. v. United States*,
   11 F. Supp. 3d 1326 ............................................................................23

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
   822 F.3d 1289 (Fed. Cir. 2016) ......................................... 22, 23, 24, 26

*Lasko Metal Prod. v. United States*,
   43 F.3d 1442 (Fed. Cir. 1994) ..............................................................26

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...............................................................................56

*Marmen Inc. v. United States*,
   134 F.4th 1334 (Fed. Cir. 2025)......................................................58, 60

*Nation Ford Chem. Co. v. United States*,
   166 F.3d 1373 (Fed. Cir. 1999) ......................................................23, 24

*Neimenggu Fufeng Biotechnologies Co. v. United States*,
   741 F. Supp 3d 1354 (Ct. Int'l Trade 2024)..................................19, 65

*OSI Pharms., LLC v. Apotex Inc.*,
   939 F.3d 1375 (Fed. Cir. 2019) ......................................................48, 54

*Shandong Huarong Gen. Corp. v. United States*,
   159 F. Supp. 2d 714 (Ct. Int'l Trade 2001).........................................20

*Shanghai Tainai Bearing Co., Ltd. v. United States*,
   658 F. Supp. 3d 1269 (Ct. Int'l Trade 2023).................... 19, 63, 65, 67

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)...........................................................................56, 59

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021)................................................. 13, 57, 58

*Stupp Corp. v. United States*,
   619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023)........................................13

*Tri Union Frozen Prods., Inc. v. United States,*
    227 F. Supp. 3d 1387 (Ct. Int'l Trade 2017)......................................24

*Wheatland Tube Co. v. United States,*
    495 F.3d 1355 (Fed. Cir. 2007) ..........................................................62

*Writing Instrument Mfrs. Ass'n, Pencil Section v. Dep't of Commerce,*
    984 F. Supp. 629 (Ct. Int'l Trade 1997)............................ 41, 44, 47, 48

*Xinjiamei Furniture (Zhangzhou) Co. v. United States,*
    37 CIT 308 (Ct. Int'l Trade 2013) ..................................................28, 29

*Zhejiang DunAn Hetian Metal Co. v. United States,*
    652 F.3d 1333 (Fed. Cir. 2011) ..................................................23, 24, 26

*Zhejiang Mach. Imp. & Exp. Corp. v. United States,*
    31 CIT 159 (2007) ................................................................................35

Statutes

18 U.S.C. § 1001 ......................................................................................38

19 U.S.C. § 1673 ......................................................................................21

19 U.S.C. § 1677a(c)(2)(A) ..........................................................15, 62, 67

19 U.S.C. § 1677b(c) ........................................................................ passim

19 U.S.C. § 1862 ......................................................................................62

19 U.S.C. § 2411 ......................................................................................60

Regulations

19 C.F.R. § 351.408(c)(2) .......................................................... 23, 24, 26

Other Authorities

*Addressing China's Laws, Policies, Practices, and Actions Related to*
    *Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007
    (Executive Office of the President Aug. 17, 2017) ..............................60

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 35,067 (Dep't of Commerce May 1, 2024)..................................................................................... 4, 10

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 88,730 (Dep't Commerce Nov. 8, 2024)........................................................................................................ 2

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021, 38,027 (Dep't of Commerce June. 12, 2023)........................................................................................................... 3

*Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 28,710, 28,711-12 (U.S. Trade Rep. June 20, 2018)........................................ 61

*Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40,823, 40,824 (U.S. Trade Rep. Aug. 16, 2018) ........................................................ 62

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 14,906, 14,906 (U.S. Trade Rep. Apr. 6, 2018)........................... 61

*Notice of Modification in Section 301 Action*, 83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 18, 2018) ................................................................ 62

Proclamation 9705........................................................................... 63, 64

GLOSSARY

| Abbreviation | Term |
|---|---|
| AUV | Average Unit Value |
| Coalition | Coalition of American Manufacturers |
| Commerce | U.S. Department of Commerce |
| Dingli | Zhejiang Dingli Machinery Co., Ltd. |
| HS | Harmonized System |
| HTS | Harmonized Tarff Schedule |
| HTSUS | Harmonized Tarff Schedule of the United States |
| IDM | Issues and Decision Memorandum |
| PDM | Preliminary Decision Memorandum |
| SV | Surrogate Value |
| USTR | Office of the United States Trade Representative |

Pursuant to Rule 56.2 of the Rules of United States Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motions for judgment on the administrative record filed by the consolidated plaintiffs, Coalition of American Manufacturers of Mobile Access Equipment (Coalition), and Zhejiang Dingli Machinery Co., Ltd. (Dingli).[1]  24-219 ECF No. 34 (Coalition Br.); 24-221 ECF No. 34 (Dingli Br.).  The Coalition and Dingli challenge certain aspects of the Department of Commerce's final results of the 2022-2023 administrative review of the antidumping order covering certain mobile access equipment and subassemblies thereof from the People's Republic of China (China).  For the reasons explained below, the Court should sustain the final results because it is supported by substantial evidence and is otherwise in accordance with law.

---

[1] Pursuant to the Court's March 24, 2025 Scheduling Order, case number 24-219 and case number 24-221 were consolidated for the limited purpose of briefing.  Case 24-219, ECF No. 24.  Where we refer to a docket entry, we have included the case number for ease of reference.

<u>STATEMENT PURSUANT TO RULE 56.2</u>

I.    <u>The Administrative Determination Under Review</u>

The administrative determination under review is *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 88,730 (Dep't Commerce Nov. 8, 2024) (*Final Results*) (P.R. 298), Appx___-___, and accompanying Issues and Decision Memorandum (IDM) (P.R. 294), Appx___-___.  The period of review is April 13, 2022, through March 31, 2023.

II.    <u>Issues Presented for Review</u>

1.    Whether Commerce's selection of Türkiye as the primary surrogate country is supported by substantial evidence and in accordance with law.

2.    Whether Commerce's selection of Bulgarian data to value surrogate values for three inputs is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's selection of certain HTS[2] Codes to value surrogate values for three inputs is supported by substantial evidence and in accordance with law.

4.      Whether Dingli has standing to challenge Commerce's differential pricing methodology.

5.      Whether Commerce's deduction of section 301 duties from U.S. sales prices is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On June 12, 2023, Commerce initiated the first administrative review of the antidumping duty order covering certain mobile access equipment and subassemblies thereof from China, for the period April 13, 2022, through March 31, 2023.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021, 38,027 (Dep't of Commerce June. 12, 2023) (P.R. 6), Appx___.

---

[2] The administrative record refers to the Harmonized Tariff Schedule (HTS) and Harmonized System (HS) categories when discussing surrogate values for certain inputs of mobile access equipment. HS codes are global and therefore the same for each country through the 6-digit level.  HTS codes become different when expanded to the 8-, 10-, or 12-digit levels.

Commerce selected a sole mandatory respondent, Dingli. *See* IDM at 1, Appx\_\_\_.

Because China is a non-market economy country, Commerce is required to calculate the normal value of certain mobile access equipment and subassemblies thereof based on surrogate values in a comparable market economy. *See* 19 U.S.C. § 1677b(c)(1). Pursuant to 19 U.S.C. § 1677b(c)(4), to select a primary surrogate country, Commerce compiled a surrogate country list of market economies that are comparable to China in terms of economic development. *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 35,067 (Dep't of Commerce May 1, 2024) (Preliminary Results) (P.R. 257), Appx\_\_\_-\_\_\_, and accompanying Preliminary Issues and Decision Memorandum (PDM) at 3 (P.R. 249), Appx\_\_\_-\_\_\_.

The surrogate country list identified Romania, Chile, Bulgaria, Costa Rica, Malaysia, and Türkiye as economically comparable based on per capita gross national income data available from the 2022 World Bank's World Development Report. *See* Letter re: Request for Economic, Development, Surrogate Country and Value Comments and

Information (October 30, 2023) (SC Request) at Attachment 1 (SC List), (P.R. 99), Appx___; and PDM at 7, Appx___.  Commerce released the Surrogate Country List and solicited comments regarding the selection of the surrogate country and offered interested parties an opportunity to provide surrogate value data.  *See SC Request* at 1-3, Appx___-Appx___.

From November 2023 through April 2024, the Coalition and Dingli submitted factual information and arguments on the selection of the primary surrogate country and surrogate values.  *See* PDM at 6-13, Appx___-___; *see also* Letter re: Dingli's Surrogate Countries Comments (November 16, 2023) (Dingli SC Comments) (P.R. 105), Appx___-___; Letter re: First Submission of Surrogate Values (December 14, 2023) (Coalition SV Comments) (P.R. 139), Appx___-___; Letter re: Dingli's First Surrogate Value Comments (Dingli SV Comments) (December 14, 2023) (P.R. 127), Appx___-___; Letter re: Submission of Information to Rebut, Clarify or Correct Surrogate Value Information (December 21, 2023) (P.R. 147), Appx___-___; Letter re: Dingli's Final Surrogate Value Comments (March 27, 2024) (Dingli Final SV Comments) (P.R. 187), Appx___-___; Letter re: Final Submission of Surrogate Values (March

27, 2024) (Coalition Final SV Submission) (P.R. 213), Appx___-___;

Letter re: Dingli's Pre-Preliminary Comments (April 1, 2024) (Dingli

Pre-Prelim Comments) (P.R. 221), Appx___-___; Letter re: Final

Rebuttal Submission of Surrogate Values (April 8, 2024) (P.R. 223),

Appx___-___; Comments in Advance of the Preliminary Results

Regarding Dingli (April 11, 2024) (P.R. 236), Appx___-___; and Letter

re: Dingli's Revised Final Surrogate Value Rebuttal Comments (April

15, 2024) (P.R. 239), Appx___-___.  No party challenged Commerce's list

of economically comparable countries.  IDM at 6, Appx___.

　　　　Dingli submitted export-import data for all six countries on the

surrogate country list and demonstrated that all six countries were

significant producers of comparable merchandise during the period of

review, based on HTS Codes 842720, 842790, 843120 and 842710.  *See*

Dingli SC Comments at 5, Appx___; *see also* PDM at 9, Appx___.

Because all six countries are economically comparable and significant

producers of comparable merchandise, Dingli argued that Commerce

should choose the primary surrogate country that sources the best

quality of surrogate value data and financial statements of producers.

*See id*. at 5-6, Appx___-___.  Moreover, Dingli argued that Commerce's

practice supports selecting a secondary surrogate country "if such {surrogate value} data {from the secondary surrogate country} is more product specific and reliable as compared to those available from the selected primary surrogate country." *See* Dingli Pre-Prelim Comments at 3, Appx___.  Dingli placed surrogate value data for Malaysia, Bulgaria, Romania, and Türkiye on the record, but requested that Commerce select Bulgaria as the primary surrogate country.  *See* Dingli SV Comments, Appx___-___; Dingli Final SV Comments, Appx___-___; and Dingli Pre-Prelim Comments, Appx___-___.

The Coalition submitted surrogate value data for Türkiye and requested that Commerce select Türkiye as the primary surrogate country.  *See* Coalition SV Comments, Appx___-___; and Coalition Final SV Submission, Appx___-___.  The Coalition argued that Türkiye's data availability is superior to the data availability of other countries on the surrogate country list because the Turkish data "includes prices for all inputs and expenses which are publicly available, representative of a broad market average, tax- and duty- exclusive, specific to the input being valued, otherwise free from defect, and nearly all are contemporaneous with the period of review."  *See* Coalition SV

Comments at 3-4, Appx___-___; and Coalition Final SV Submission at 3,

Appx___; *see also* PDM at 7, Appx___.

With respect to surrogate financial ratios, the Coalition submitted

financial statements from two Turkish companies: Tümosan Motor ve

Traktör Sanayi A.Ş. (Tümosan Motor) and Türk Traktör Ve Ziraat

Makineleri A.Ş. (Türk Traktor). *See* Coalition SV Comments at

Exhibits 15-C and 15-D, Appx___-___. Dingli provided financial

statements for five Bulgarian companies, including Dimexlift Group AD

(Dimexlift). *See* Dingli Final SV Comments at Exhibit BG-11A,

Appx___-___.

Dingli argued that Turkish SV data, as well as the data in

financial statements of Turkish companies are unreliable. *See* Dingli

SC Comments at 4-6, Appx___-___; and Dingli Pre-Prelim Comments at

3-16, Appx___-___. Relying on the opinion of an expert retained by

Dingli and the Canadian government's findings in its own antidumping

investigation, Dingli argued that hyperinflation in Türkiye during the

POR distorted Turkish surrogate value data, and thus, rendered them

unusable. *See* Dingli Final SV Comment at Exhibit TR-9B-1, Appx___-

___; and Dingli Pre-Prelim Comments at 10-11, Appx___-___. Moreover,

8

Dingli argued that Tümosan Motor's financial statements are unusable because they are distorted by the inclusion of countervailable subsidies. *See* Dingli Pre-Prelim Comments at 14-15, Appx\_\_\_-\_\_\_.

The Coalition argued that Commerce should disregard Dingli's concerns regarding hyperinflation because Commerce used Türkiye as a surrogate country in multiple proceedings; the Turkish import data is recorded in Euros; and Dingli failed to demonstrate that the Turkish financial statements are distorted by hyperinflation. *See* Coalition Pre-Prelim Comments at 6-20, Appx\_\_\_-\_\_\_. Similarly, the Coalition argued that Commerce should disregard Dingli's argument against using Tümosan Motor's financial statement because Dingli's argument is mere speculation that relies on "purchased testimony" of an expert, whose opinion is "limited to finding that {Tümosan Motor} 'most likely benefited from {countervailable programs}." *See* Coalition Pre-Prelim Comments at 18, Appx\_\_\_.

Additionally, Dingli and the Coalition disagreed on the proper HTS classification, and corresponding import average unit values, with which Commerce should find surrogate values for said inputs. *See*

9

Coalition Final SV Comments at Exhibit 1, Appx___-___; and Dingli

Final SV Comments at Exhibit BG-1, Appx___-___.

On April 25, 2024, Commerce published its preliminary results.

Preliminary Results, 89 Fed. Reg. 35,607, Appx___, and accompanying

PDM, Appx___.  Commerce preliminarily found all six countries on the

surrogate country list to be economically comparable to China and

produced significant amount of comparable merchandise during the

period of review.  *See* PDM at 7-9, Appx___-___.  Accordingly, Commerce

found that all six countries satisfy the requirements of 19 U.S.C.

§ 1677b(c)(4)(A)-(B).  Pursuant to its longstanding practice, because

more than one country on the surrogate country list satisfied the

statutory requirements, Commerce selected the primary surrogate

country based on data availability and reliability.  *See id.* at 9, Appx___;

*see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy

Surrogate Country Selection Process, *Policy Bulletin* 04.1 (2004),

*http://enforcement.trade.gov/policy/bull04-1.html* (last accessed

March 4, 2026) (Policy Bulletin 04.1).

In the preliminary results, Commerce selected Türkiye as the

primary surrogate country.  *See* PDM at 13, Appx___.  Commerce found

that Türkiye "(1) is at a level of economic developed comparable to China; (2) is a significant producer of merchandise comparable to the subject merchandise; and (3) provides the best available data for valuing {factors of production}."  Specifically, Commerce noted that Türkiye and Bulgaria provide superior data than other countries on the surrogate country list, but the Bulgarian movement expenses data lacked the calculated inflators, which Commerce needed to adjust the outdated data to accurately reflect the expenses during the period of review.  *See id.* at 11, Appx___.  Additionally, Commerce noted that Türkiye provides more complete, and thus, the best available information to calculate financial ratios than Bulgaria.  *See id.* at 13, Appx___.

Commerce also noted in the preliminary results that Dingli and the Coalition disagreed on HTS classification of key material inputs. Notwithstanding the disagreement, Commerce found that "only the Bulgarian import data provided average unit values for appropriate HTS categories with respect to certain inputs.  *See id.* at 10, Appx___. Accordingly, Commerce used the Bulgarian data to value Dingli's factors of production with respect to the following inputs: lead-acid

battery, motor controller, hot rolled and cold rolled steel tube, rectangular steel tube, patterned steel plate with thickness equal to or greater than 3 millimeters but less than 4.75 millimeters, steel plate with thickness equal to or greater than 4.75 millimeters but less than or equal to 10 millimeters, and patterned steel plate with thickness less than 3 millimeters. *See id.* at 13, Appx\_\_\_.

From June 5, 2024, through June 17, 2024, Commerce received case briefs and rebuttal case briefs from the parties. *See* Letter re: Case Brief (June 5, 2024) (Coalition Case Brief) (P.R. 269), Appx\_\_\_-\_\_\_; Letter re: Dingli's Revised Case Brief (June 20, 2024) (Dingli Case Brief) (P.R. 280), Appx\_\_\_-\_\_\_; Letter re: Rebuttal Brief (June 17, 2024) (Coalition Rebuttal Brief) (P.R. 278), Appx\_\_\_-\_\_\_; and Letter re: Dingli's Rebuttal Brief (June 17, 2024) (Dingli Rebuttal Brief) (P.R. 274), Appx\_\_\_-\_\_\_.

Dingli and the Coalition continued to disagree on which HTS codes Commerce should use to value certain of Dingli's inputs, including, but not limited to, motor controllers, hot-rolled and cold-rolled steel tubes, rectangular steel tube, brakes, steel forearm articles, and circuit brakers. *See* Coalition Case Brief at 15-21, 25-42, Appx\_\_\_-

___, Appx___-___; Dingli Rebuttal Brief at 14-48, Appx___-___.  Dingli
continued arguing that Commerce should not use any of Turkish data
because they are distorted by hyperinflation.  *See* Dingli Case Brief at
3-24, Appx___-___.  Dingli also argued that Commerce should not
deduct Section 301 duties from U.S. sales prices in calculating Dingli's
dumping margin.  *See id.* at 56-64, Appx___-___.  Conversely, the
Coalition argued that Commerce "should follow its well-established
practice and continue to deduct Section 301 duties from U.S. price in
the final results."  *See* Dingli Rebuttal Brief at 58, Appx___.  Lastly,
Dingli argued that Commerce's application of the Cohen's d test to
Dingli's U.S. sales is unsupported by law and evidence.  *See id.* at 45-56,
Appx___-___.  In response, the Coalition argued that Dingli failed to
understand Commerce's established practice and "misconstrued" the
Federal Circuit's decision in *Stupp Corp. v. United States*, 5 F.4th 1341
(Fed. Cir. 2021) and this Court's decision in *Stupp Corp. v. United
States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023).  *See* Coalition
Rebuttal Brief at 53-57, Appx___-___.

On November 4, 2024, Commerce published its final results.
Commerce continued to select Türkiye as the primary surrogate country

because it is at the same level of economic development as China, is a significant producer of comparable merchandise, and has publicly available data for all the respondents' FOPs that constitute the best available information on the record.  IDM at 5-12, Appx___-___..  Commerce also noted that no party, including Dingli, disagreed that Turkish data satisfies all five factors that Commerce considers in evaluating surrogate value data: (1) publicly available; (2) contemporaneous with the POR; (3) representative of a broad market average; (4) tax and duty exclusive; and (5) specific to the inputs being valued.  *See* IDM at 7 (citing Policy Bulletin 04.1), Appx___.

Additionally, upon closer examination of the record, Commerce identified alternative HTS codes that are more specific to certain of Dingli's input.  *See* IDM at Comment 11, Appx___.  As a result, Commerce was able to use corresponding Turkish data for four out of seven of these inputs.  *See id.*  Accordingly, Commerce used Turkish data for all inputs, except three (motor-controllers, hot-rolled and cold-rolled steel tubes, and rectangular tube), for which Commerce continued to rely on Bulgarian data because there was no corresponding Turkish data for these three inputs.  *See id.*  Commerce relied on its established

practice to value all inputs using a single primary surrogate country to the extent possible. *See* Policy Bulletin 04.1; *see also* IDM at 48, Appx___. For certain other inputs, including brakes, steel forearm articles, and circuit breakers, Commerce continued to rely on the same HTS codes. *See* IDM at 55-71, Appx___-___.

Additionally, Commerce found Dingli's arguments against Commerce's use of the Cohen's *d* test in its differential pricing analysis to be moot because the results of the Cohen's *d* test did not affect the results of this administrative review. *See* IDM at 43, Appx___. Specifically, Commerce explained that the results of the Cohen's *d* test had no impact as Commerce did not deviate from its normal average-to-average methodology in calculating the weighted-average dumping margin. *See id.* Lastly, Commerce found that it appropriately deducted section 301 duties from U.S. sales prices when calculating Dingli's dumping margin, pursuant to 19 U.S.C. § 1677a(c)(2)(A) and consistent with binding precedent and Commerce's practice. *See id.* at 44-45, Appx___-___. Commerce determined that the weighted-average dumping margin of 12.39 percent exists for the period of review for Dingli. *See Final Results* at 88,730.

## SUMMARY OF THE ARGUMENT

Commerce's final results in the 2022–2023 administrative review are supported by substantial evidence and are in accordance with law. The agency reasonably exercised its discretion under 19 U.S.C. § 1677b(c) in selecting a primary surrogate country, evaluating surrogate values, and choosing appropriate HTS categories to value Dingli's factors of production.

Commerce lawfully selected Türkiye as the primary surrogate country and Bulgaria as a surrogate country for three inputs pursuant to 19 U.S.C. § 1677b(c)(4). Commerce reasonably determined that Türkiye is economically comparable to China, is a significant producer of comparable merchandise, and provides the best available data for valuing most inputs. Commerce further determined, consistent with its statutory discretion, that Bulgarian data were appropriate for certain inputs where Turkish data were either unavailable or less reliable. These determinations were supported by record evidence and consistent with Commerce's established surrogate-country selection methodology.

Commerce reasonably rejected the Coalition's arguments that Turkish data must be used whenever available and that Bulgaria was

an improper surrogate country to value the three inputs at issue. The record demonstrates that Commerce carefully evaluated the quality, contemporaneity, and specificity of the data on an input-by-input basis. Where Bulgarian HTS data more closely matched the physical characteristics and commercial reality of Dingli's inputs, Commerce permissibly relied on those data. The statute does not require Commerce to select the narrowest possible tariff category, nor does it compel Commerce to use a single surrogate country for all inputs where doing so would reduce data reliability.

Commerce reasonably exercised its discretion in selecting HTS classifications for contested inputs. As explained in the IDM, Commerce compared the product descriptions, the scope of the HTS headings, and the record evidence describing Dingli's inputs, and selected HTS categories that best reflected the merchandise being valued. Where parties proposed narrower subheadings, Commerce explained that the record did not demonstrate that those categories more accurately described the inputs or produced more reliable surrogate values. The Coalition's arguments to the contrary rest on speculation and requests for this Court to reweigh record evidence.

The agency applied the correct legal framework, explained its reasoning, and supported its conclusions with substantial evidence. The Coalition's disagreement with Commerce's methodological choices does not establish that Commerce acted unlawfully or unreasonably. Because Commerce's selections reflect a reasonable evaluation of the record and a permissible exercise of its discretion, the Court should sustain the final results in their entirety.

Further, Commerce's determination to deduct section 301 duties from Dingli's U.S. price is supported by substantial evidence and in accordance with law. The Federal Circuit recently held that the relevant consideration when determining whether duties are United States import duties, and therefore should be deducted from U.S. price, is the legal instrument implementing those duties and whether that instrument indicates that the duties are intended to be assessed in addition to antidumping or countervailing duties. *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023). This Court has since held that the section 301 duties proclaimed in 2018 are intended to be assessed in addition to antidumping duties and are therefore United States import duties. *See*

*e.g. Shanghai Tainai Bearing Co., Ltd. v. United States*, 658 F. Supp. 3d 1269, 1292 (Ct. Int'l Trade 2023); *see also Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp 3d 1354, 1379-83 (Ct. Int'l Trade 2024).

Finally, Dingli does not have standing to challenge Commerce's differential pricing methodology. Although Commerce applied the Cohen's *d* methodology to determine whether Dingli's sales exhibited a pattern of differential pricing, Commerce ultimately found that the use of an average-to-transaction methodology resulted in no meaningful difference to Dingli's dumping margin. Therefore, Commerce's differential pricing methodology had no impact on the dumping margin calculated in this case. Dingli suffered no material harm as a result of the Cohen's *d* test and therefore lacks standing to challenge Commerce's differential pricing methodology.

ARGUMENT

I.    Standard Of Review

The Court will uphold Commerce's antidumping duty determination if it is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

That the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) (citation omitted).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); s*ee also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the

choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." (citations and internal quotation marks omitted)).

II.    Commerce's Selection of Türkiye as the Primary Surrogate Country
       Is Supported by Substantial Evidence and in Accordance with Law

Dingli challenges Commerce's selection of Türkiye over Bulgaria as the primary surrogate country, contending that hyperinflation rendered Turkish data unreliable and that Bulgaria offered superior information. *See* Dingli Br. 19-42. Dingli's arguments misstate the governing legal standard, selectively reweigh the record, and disregard Commerce's reasoned explanations in the preliminary and final results. Substantial evidence supports Commerce's determinations, and the Court should sustain them.

A.    Legal Framework and Commerce's Methodology

An antidumping duty represents the amount by which the "normal value" of subject merchandise exceeds its "export price (or the constructed export price)." 19 U.S.C. § 1673. In proceedings involving a non-market economy, such as China, Commerce determines the subject merchandise's normal value by relying on the "best available information" from a market economy country or countries to derive

21

surrogate valuations for the Chinese entity's factors of production, including raw materials, labor, and utilities.  *See* 19 U.S.C. § 1677b(c). To those factors, Commerce also adds "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.*

Commerce must use, "to the extent possible," surrogate factors from "one or more market economy countries that are — {(1)} at a level of economic development comparable to that of the nonmarket economy country, and {(2)} significant producers of comparable merchandise." *Id.* § 1677b(c)(4)(A)-(B).  If more than one market economy country is economically comparable, and a significant producer of comparable merchandise, then Commerce evaluates and compares the reliability and completeness of the record data from those countries.  Policy Bulletin 04.1; *see also* Letter from Petitioners re: Surrogate Country Comments, dated November 22, 2022 (P.R. 36) at Exhibit 1, Appx___-___.

By statute, Commerce must select the "best available information" on record to value the factors of production.  *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016) (citing

19 U.S.C. § 1677b(c)(1)(B)).  Because the statute is silent regarding

what constitutes the "best available information," Commerce possesses

"broad discretion" in deciding what record evidence meets the criteria.

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341

(Fed. Cir. 2011) (citations omitted); *Nation Ford Chem. Co. v. United

States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).  In practice, Commerce

strives to select, to the extent practicable, surrogate values that are

product-specific, representative of a broad-market average, publicly

available, contemporaneous with the period of review, and tax and duty

exclusive.  *See* Policy Bulletin 04.1; *see also Jiaxing Bro.*, 822 F.3d at

1293.

Commerce also has a regulatory preference to use as much data as

possible from a single primary surrogate country.  *See* 19 C.F.R.

§ 351.408(c)(2); *Jiaxing Bro.*, 822 F.3d at 1294, 1294 n.3 (citing Policy

Bulletin 04.1).  Commerce will "*only resort* to a secondary surrogate

country if data from the primary surrogate country are *unavailable or

unreliable*."  *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d

1326, 132–33 (Ct. Int'l Trade 2014) (citations omitted) (emphasis

added), *aff'd*, *Jiaxing Bro.*, 822 F.3d 1289.

Commerce may rely on "imperfect" data. *Jiaxing Bro.*, 822 F.3d at 1301 (citing *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id.*

Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, a review of Commerce's determination should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing*, 822 F.3d at 1301 (citing *Zhejiang*, 652 F.3d at 1341). Where multiple economically comparable countries are significant producers of comparable merchandise, Commerce exercises discretion to select the primary surrogate country based on data quality and completeness, including the availability of contemporaneous, publicly available surrogate values and usable financial statements. *See* 19 C.F.R. § 351.408(c)(2); *Tri*

24

*Union Frozen Prods., Inc. v. United States*, 227 F. Supp. 3d 1387, 1394–95 (Ct. Int'l Trade 2017).

Commerce generally identifies economically comparable countries by reference to per-capita gross national income, which it uses as the metric for economic comparability, and no party disputed that multiple countries on the record satisfy these statutory thresholds.  PDM at 6-8, Appx___-___.  Where more than one potential surrogate country satisfies the statutory requirements, Commerce selects the primary surrogate country based on the availability and reliability of surrogate value data.  *Id.* at 9, Appx___.  Consistent with Policy Bulletin 04.1, Commerce recognizes that data quality is a critical consideration because a country that meets the statutory criteria is not suitable as a primary surrogate if crucial factor price data are inadequate or unavailable.  IDM at 10, Appx___.

There is no hierarchy among these criteria; rather, Commerce seeks to satisfy the breadth of the criteria and weighs the evidence in light of the particular facts of the industry and the record as a whole.  *Id.* at 7, Appx___.  Commerce prefers, where practicable, to value all factors of production in a single surrogate country.  PDM at 10,

Appx___; *see also* 19 C.F.R. § 351.408(c)(2).  Applying these principles,
Commerce evaluates the totality of the record evidence and makes a
product-specific and case-specific determination as to which surrogate
country provides the "best available information" for valuing the
respondent's factors of production.

Contrary to Dingli's framing, the statute does not compel
Commerce to elevate a single alleged risk factor (*e.g.*, inflation) above
all others or to reject a surrogate country absent record evidence that
the surrogate data used are actually distorted.  *See Lasko Metal Prod. v.
United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (ruling that the
statute does not say that the factors of production must be ascertained
in a single fashion and that it should be determined in the manner
"considered to be appropriate" by Commerce).  Commerce must
demonstrate its determination is supported by substantial evidence;
however, it is not required to prove that its selection is flawless as long
as a "reasonable mind could conclude that Commerce chose best
available information." *Jiaxing Bro.*, 822 F.3d at 1301 (citing *Zhejiang*,
652 F.3d at 1341).

Here, Commerce applied its established criteria, reviewed the competing records, and selected Türkiye based on record-supported differences in data usability and completeness, including (1) the availability of record inflators needed to make movement surrogate values contemporaneous to the period of review and (2) the availability of two usable Turkish financial statements for producers of comparable merchandise.  *See* PDM at 12, Appx___.

Dingli's "disjunctive" framing is misplaced.  Commerce did not "end-run" a comparative assessment; it identified the specific, record-based limitations of Bulgaria's dataset (movement inflators and unusable financial statements) and explained why Dingli's inflation-based objections did not establish that the particular Turkish average unit values and financial statements relied upon were distorted or unreliable.  *See* IDM at 21–27, Appx___-___.

B.    Commerce Reasonably Found No Record Evidence That the Turkish Import Average Unit Values Were Distorted by Hyperinflation

Dingli devotes substantial briefing to macroeconomic conditions in Türkiye, but Commerce's task is not to adjudicate macroeconomic policy; it is to determine whether the specific surrogate data used are

non-aberrational and reliable for purposes of valuing FOPs. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 37 CIT 308, 318 (Ct. Int'l Trade 2013) (ruling that the substantial evidence standard requires Commerce to explain why its chosen surrogate data is reliable and non-aberrational).

Commerce reasonably concluded that Dingli failed to demonstrate that the Turkish import average unit values relied upon were distorted by hyperinflation. Commerce acknowledged that Türkiye experienced hyperinflation during the period of review and agreed that domestic prices and import prices measured in Turkish lira would exhibit hyperinflationary trends. IDM at 9, Appx___. However, Commerce found this fact insufficient to disqualify the surrogate data at issue because the import average unit values used to value Dingli's FOPs were denominated in euros, and the record did not establish that euro-denominated import prices were distorted. *Id*. Commerce further found that the International Monetary Fund economist's opinion on which Dingli relied did not address whether import prices traded or settled in foreign currencies would mirror lira-based inflation and that the record did not establish "in which specific currency" the

preponderance of the relevant imports were actually traded and settled. *Id*. On this record, Commerce reasonably declined to presume distortion of euro-denominated average unit values based solely on domestic inflation conditions.

Commerce also directly addressed and rejected Dingli's related theory that alleged government suppression of exchange-rate depreciation exacerbated distortion when import values were converted into euros. IDM at 11, Appx___. Commerce explained that exchange rates are influenced by numerous factors beyond inflation, including interest rates, capital flows, and market expectations. Commerce found "no record evidence," "much less empirical evidence," demonstrating that Turkish import average unit values (AUVs) measured in euros were overstated or unreliable due to exchange-rate conditions. *Id*. Commerce reasonably characterized Dingli's argument as theoretical conjecture unrelated to the actual surrogate data used, which does not satisfy the burden of demonstrating aberrational values. *See Xinjiamei Furniture (Zhangzhou)*, 37 CIT at 318. Commerce's conclusion was further supported by record evidence demonstrating the stability of the euro-denominated Turkish import AUVs used in the calculations.

Commerce relied on HS-subheading-specific, period of review-monthly

data showing that quantities varied little month-to-month and that

prices remained stable for the vast majority of inputs, with no

persistent upward trend even where variation existed.  IDM at 11

(citing Coalition Rebuttal Brief at 14-15 and Exhibit 1), Appx___.

Commerce reasonably relied on this HS-specific analysis as substantial

evidence that the surrogate values were not distorted by hyperinflation.

Commerce likewise evaluated Dingli's expert submissions and

determined that, while expert input may be considered, the opinions

offered did not establish a nexus between macroeconomic conditions and

distortion of the specific euro-denominated average unit values used.

*Id*. at 9-11, Appx___-___.

Finally, Commerce reasonably rejected Dingli's reliance on the

Canadian government's particular market situation findings concerning

Turkish rebar.  Commerce explained that it has no practice of importing

particular market situation determinations from foreign authorities

into surrogate country selection in nonmarket economy proceedings,

particularly where those findings concern a different product, record,

and legal framework.  IDM at 10–11, Appx___-___.  Commerce further

found that Dingli failed to demonstrate that billet or scrap pricing influenced the steel inputs used to produce subject merchandise, that Russian-origin imports materially affected Turkish steel prices during the period of review, or that any such influence distorted the import average unit values relied upon, especially where Russian imports were excluded from Commerce's average unit value calculations and constituted a relatively small share of Turkish steel imports. *Id.*

Taken together, Commerce's findings reflect a reasoned evaluation of the entire record and constitute substantial evidence supporting its conclusion that Dingli failed to demonstrate that the euro-denominated Turkish import average unit values used in this review were aberrational or unreliable. Commerce therefore acted reasonably in declining to disqualify Türkiye as a surrogate country based on hyperinflation.

C.   Commerce Reasonably Relied on Turkish Financial Statements and Explained Why They Were Usable

Dingli asserts that Turkish financial statements were unreliable due to hyperinflation and alleged subsidies. Commerce relied on the Turkish financial statements and adequately explained why they were usable and the best available information on this record,

31

notwithstanding Dingli's allegations concerning hyperinflation and

subsidies.  Commerce's analysis reflects a dataset-specific, comparative

evaluation grounded in record evidence and consistent with its

established practice and governing law.

Commerce explained that Türkiye provided two contemporaneous,

audited financial statements for producers of merchandise comparable

to the subject merchandise, Tumosan and Turk Traktor, which

supported a reliable calculation of surrogate financial ratios.  PDM at

11-12, Appx___-___; IDM at 25-26, Appx___-___.  Both companies

produce machinery with functionalities comparable to mobile access

equipment and are likely to consume similar major inputs, including

steel components, hydraulics, motors, electrical systems, and fabricated

assemblies.  IDM at 25, Appx___.  Commerce further emphasized that

the Turkish statements were detailed and comprehensive, containing

explanatory notes necessary to understand the classification of

revenues and expenses and to calculate cost, SG&A, and profit ratios

consistent with Commerce's surrogate methodology.  *Id*.

By contrast, Commerce found that the Bulgarian financial

statements proposed were incomplete or otherwise unusable for ratio

calculation.  In particular, Commerce explained that the annual report

for Dimexlift, the sole Bulgarian producer of comparable merchandise,

was "substantially less detailed," consisting only of a balance sheet, an

income statement, and a short director's report.  IDM at 22, Appx___.

Although the balance sheet and income statement repeatedly

referenced an "Annex" containing explanatory notes, that Annex was

not included on the record.  *Id.*  Commerce determined that reliance

solely on the balance sheet and income statement, without the

explanatory notes, would result in a "rudimentary" calculation of

financial ratios and risk oversimplifications and inaccuracies relative to

the ratios derived from the more complete Turkish statements.  *Id.* at

23, Appx___.

Commerce further explained that the absence of explanatory notes

prevented it from determining whether Dimexlift's "other revenue"

reflected normal business operations and, if so, how that revenue

should be treated for ratio purposes, whether as operating revenue,

financial income, SG&A offsets, or traded goods revenue.  IDM at 23,

Appx___.  Without this information, Commerce could not determine

whether Dimexlift was profitable from normal business operations in

2022 or how to allocate revenues and expenses in calculating surrogate financial ratios. *Id*. These were concrete, record-based deficiencies that directly implicated Commerce's ability to calculate accurate ratios, not a pretextual basis for rejecting Bulgarian data.

Commerce also addressed Dingli's argument that hyperinflation rendered the Turkish financial statements unreliable. IDM at 13–16, Appx___-___. Commerce acknowledged the inflationary environment in Türkiye during the period of review but reasonably concluded that Dingli failed to demonstrate that the specific Turkish financial statements used were distorted or unusable for purposes of calculating surrogate ratios in this review. *Id*. Commerce explained that the relevant inquiry is not whether alternative accounting treatments or inflation adjustments could exist in the abstract, but whether the financial statements on the record are sufficiently reliable and usable to calculate surrogate ratios. *Id*. Dingli's position effectively sought a categorical rule disqualifying Turkish financial statements based on macroeconomic conditions alone, which Commerce reasonably rejected in favor of a statement-specific, record-based analysis.

Commerce likewise considered and rejected Dingli's allegations that the Turkish financial statements were distorted by countervailable subsidies.  IDM at 16, Appx\_\_\_.  Specifically, Commerce found that Dingli failed to provide any affirmative evidence in the financial statements that the Turkish companies actually benefitted from any countervailable subsidy.  *Id.*  Mere allegations or general references to subsidy programs do not compel rejection of financial statements absent record evidence showing distortion of the ratios actually used.  *See Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 31 CIT 159, 168–69 (2007).

In sum, Commerce found that Türkiye provided two high-quality, contemporaneous, and complete financial statements suitable for calculating surrogate financial ratios, while Bulgaria did not. Commerce's explanation reflects a reasoned comparison of data quality and usability and constitutes substantial evidence supporting its reliance on the Turkish financial statements in this review.

III.   Commerce's Valuation of Certain Surrogate Values with Bulgarian, Rather Than Turkish, Data is Supported by Substantial Evidence and Otherwise in Accordance with Law

Commerce's selection of Türkiye as the primary surrogate country and Bulgaria as the secondary surrogate country is supported by substantial evidence and otherwise in accordance with the law. *See* IDM at 6, Appx___.  Commerce's determination to select Türkiye as the primary surrogate country is lawful under 19 U.S.C. § 1677b(c)(4) because it (1) is at a level of economic development comparable to China; (2) is a significant producer of merchandise comparable to the subject merchandise; and (3) provides the best available data for valuing factors of production. *Id*.  Further, Commerce's selection of Bulgaria as the secondary surrogate country is lawful under 19 U.S.C. § 1677b(c)(4) because Bulgaria provides the best available data for valuing certain key material inputs, data that are not available in the surrogate value data from Türkiye. *Id*.

During the review, Commerce identified several direct and auxiliary material inputs which it considered crucial to the production of mobile access equipment.  PDM at 10. Throughout the review, disagreement on the best HTS classification arose regarding inputs

with HTS Codes beyond the six-digit level of the same HTS category. *Id.* Using the evidence available on the record, Commerce reasonably used a HTS selection method based on the best match between the reported physical description, fabrication details, and function of the input and the HTS subheading description; based on this selection method, Commerce primarily used Turkish data, however, in certain instances, the Bulgarian data was more appropriate. SV Memo at 2 (P.R. 250), Appx___.

Commerce's decision to use Bulgarian HTS codes for 8538.90.91, 7304.39.82, and 7306.61.99 to value Dingli's motor controllers, hot-rolled and cold-rolled steel tubes, and rectangular steel tubes, respectively, was reasonable, supported by substantial evidence, and fully consistent with section 19 U.S.C. § 1677b(c). Although Commerce selected Türkiye as the primary surrogate country, the statute does not require exclusive reliance on data from a single country. Rather, Commerce must use the "best available information" to value factors of production, even where that information is drawn from more than one surrogate source. 19 U.S.C. § 1677b(c)(1), (4).

The Coalition does not dispute that Bulgaria is an economically comparable country or that it is a permissible surrogate source. Nor does it contend that the Bulgarian data used by Commerce are aberrational or unreliable. Nonetheless, the Coalition challenges Commerce's selection of Bulgarian HTS codes for these three inputs. In doing so, the Coalition misapprehends both the record evidence and the scope of Commerce's discretion.

First, the Coalition argues that it provided sufficient record evidence for Commerce to select Turkish data over Bulgarian data by submitting "Turkish import data for all HS subheadings proposed by Dingli at the six-digit level as well as every HS subheading at the 12-digit level comprising the six-digit heading." Coalition Br. 16-17. The Coalition supports this claim by citing 18 U.S.C. § 1001, which subjects parties to criminal penalties for knowingly making material false statements to the U.S. Government. *Id*.

However, this argument mischaracterizes Commerce's determination. Commerce did not say, nor does it imply, that the Coalition knowingly made a material false statement during the review. We agree with the Coalition that they believe they have included all HS

subheadings at the six-digit and 12-digit level comprising the six-digit

heading.  To provide evidence to support its claim, the Coalition could

have provided relevant excerpts from the Turkish tariff schedule

containing the entire 12-digit HS breakouts under the six-digit HS but

failed to do so.  *See* IDM at 47 (quoting Dingli's Rebuttal Brief at 14

(P.R. 274, C.R. 238), Appx___.  Further, the Coalition demonstrated an

understanding that certain chapters of a HTS could be required, as

evidenced by its inclusion of Chapters 72-73 of the Harmonized Tariff

Schedule of the United States (HTSUS) to "rebut, correct, and clarify

certain information provided by Dingli."  *See* Rebuttal of Factual

Information on Dingli's Second Supplemental Sections C-D

Questionnaire Response (P.R. 163), Appx___.

With respect to the motor controllers, Commerce expressly

compared the competing HTS classifications proposed by the parties

and evaluated them against the record evidence describing Dingli's

motor controllers.  Based on that analysis, Commerce determined that

Bulgarian HTS 8538.90.91, covering electronic assemblies for electrical

apparatus used for switching, protection, or electrical control, most

accurately reflected the physical characteristics and function of the

39

input at issue.  *See* Preliminary Surrogate Values Memorandum at 10-11 (P.R. 250) (SV Memo), Appx\_\_\_-\_\_\_; *see also* IDM at 48-49, Appx\_\_\_-\_\_\_.

By contrast, the Turkish HTS category proposed by the Coalition, HTS 8538.90.91.0000, covers "other assembled electronic components and parts" and is broader in scope.  *See* Prelim SV Memo at 11, Appx\_\_\_.  The Coalition argues that the Bulgarian and Turkish HTS codes are identical to at least the "8-digit level and likely to the 10-digit level."  Coalition Br. 19.  However, the proposed descriptions are not identical and the Coalition's claims to the contrary lack merit.  As a result, Commerce reasonably concluded that the additional digits in the Turkish classification did not provide greater specificity or improved accuracy with respect to Dingli's motor controllers.  *See* SV Memo at 11, Appx\_\_\_.

Next, the Coalition does not contend that the Bulgarian HTS code used by Commerce is unreliable, aberrational, or otherwise fails to fulfill Commerce's surrogate value criteria.  The Coalition's argument rests on the incorrect premise that a more granular HTS code is necessarily more accurate.  Coalition Br. 14-40.  That is insufficient to

overturn Commerce's determination. The statute requires Commerce to select the *best available information*, not the most detailed tariff line. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1379 (Fed. Cir. 2015) (Commerce not required to conduct classification analysis, only which subheadings constitute the best available information).

Further, the mere fact that the 12-digit code is more specific does not render it more appropriate than a 6- or 8-digit code. Commerce may rely on broader tariff categories where they provide more reliable or representative data. *See, e.g., Writing Instrument Mfrs. Ass'n, Pencil Section v. Dep't of Commerce*, 984 F. Supp. 629, 640 (Ct. Int'l Trade 1997) (upholding the use of a broader tariff category that "most certainly included the subject merchandise," where the other data on the record was unreliable"); *Guangdong Chems. Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365, 1370-71 (Ct. Int'l Trade 2006) ("The use of broader product categories is reasonable, despite the availability of product-specific data, if a greater variety of data provides greater reliability"); *cf. Dorbest LTD v. United States*, 462 F. Supp. 2d

1262, 1289-90 (Ct. Int'l Trade 2006) (sustaining Commerce's use of a data set that included merchandise other than that being valued).

Commerce's decision is further supported by Federal Circuit precedent recognizing that broader surrogate categories may be preferable where they provide greater reliability or better reflect market conditions. *See Home Meridian*, 772 F.3d at 1295. Here, Commerce reasonably concluded that Bulgarian HTS 8538.90.91 provided a more reliable basis for valuing the motor controllers than the narrower Turkish category proposed by the Coalition.

Finally, Commerce articulated a clear and rational explanation for its decision, grounded in record evidence and consistent with its surrogate value methodology. *See* IDM at 48–49, Appx___-___. The Coalition's disagreement amounts to a request that the Court reweigh the evidence, which it may not do. *See Consolo*, 383 U.S. at 620; *see also Downhole Pipe*, 776 F.3d at 1376-77 ("While Appellants invite this court to reweigh this evidence, this court may not do so"). Accordingly, Commerce's selection of Bulgarian HTS 8538.90.91 is supported by substantial evidence and otherwise in accordance with law, and the Court should sustain Commerce's determination.

Similarly, the Coalition challenges Commerce's use of Bulgarian HTS data to value hot-rolled and cold-rolled steel tubes. The Coalition's challenge rests not on any defect in the Bulgarian data itself, but on its assertion that Turkish HTS categories should have been used instead. That argument fails for the same reasons discussed above.

Based on the record evidence, Commerce determined that the Bulgarian HTS categories more accurately reflected the inputs at issue than the Turkish categories proposed by the Coalition. *See* IDM at 49–50, Appx___-___; SV Memo at 12, Appx___. Significantly, Commerce found no record evidence demonstrating that the Turkish HTS categories were more accurate or more representative of Dingli's inputs. As Commerce explained, the Coalition failed to place any evidence on the record showing that the Turkish classifications better captured the product characteristics, chemical composition, or fabrication level of the hot-rolled or cold-rolled steel tubes. IDM at 50, Appx___.

Commerce further noted that the Coalition's argument relied largely on the numerical specificity of the Turkish HTS codes, rather than on substantive evidence demonstrating superior product matching. *Id.* Again, the Court has consistently upheld Commerce's reliance on

broader HTS categories where those categories reasonably encompass the merchandise and provide more reliable data.  *See Writing Instrument*, 984 F. Supp. at 640; *Guangdong*, 460 F. Supp. 2d at 1370–71.  Commerce is not required to select the most granular tariff line if doing so would not improve accuracy or reliability.  *See Dorbest*, 462 F. Supp. 2d at 1289–90.  Here, Commerce reasonably concluded that the Bulgarian HTS categories better reflected the physical characteristics and commercial identity of the steel tubes used by Dingli, and that the Turkish HTS categories proposed by the Coalition did not offer greater precision or reliability. SV Memo at 12, Appx___; IDM at 49–50, Appx___-___.

Moreover, as with the motor controllers, the Coalition does not contend that the Bulgarian data are aberrational, distorted, or otherwise unreliable.  Nor does it dispute that Bulgaria is an economically comparable country or an appropriate surrogate source. Its disagreement is therefore limited to Commerce's weighing of the evidence, which is not a basis for reversal or remand.  *Consolo*, 383 U.S. at 620.

Commerce's determination is further supported by Federal Circuit precedent recognizing that broader surrogate categories may be preferable where they provide greater reliability and better reflect market conditions. *Home Meridian*, 772 F.3d at 1295. Consistent with that precedent, Commerce reasonably determined that the Bulgarian HTS categories for hot-rolled and cold-rolled steel tubes constituted the best available information on the record. Because Commerce carefully evaluated the record, explained its reasoning, and selected surrogate values consistent with its statutory obligations, its determination is supported by substantial evidence and should be sustained.

Lastly, with respect to rectangular steel tubing, Commerce determined based on the record evidence that the Bulgarian HTS categories more accurately reflected the merchandise under consideration than the Turkish categories proposed by the Coalition. *See* IDM at 52-53, Appx___-___; SV Memo at 16-17, Appx___-___. Critically, Commerce found no record evidence demonstrating that the Turkish HTS categories were more appropriate or more precise.

As Commerce explained, the Coalition failed to submit evidence showing that the Turkish classifications better captured the physical

characteristics, chemical composition, or fabrication level of the rectangular steel tubes used by Dingli. IDM at 52-53, Appx___-___. Instead, its argument relied primarily on the asserted numerical specificity of the Turkish HTS codes. Commerce reasonably rejected that argument. As it explained, numerical specificity alone does not establish that a tariff category is more accurate or more reliable for surrogate valuation purposes. IDM at 52–53, Appx___-___. Rather, Commerce must evaluate whether the category reflects the actual characteristics and level of processing of the input, and whether the resulting data provided a reliable basis for valuation.

Consistent with that approach, Commerce determined that the Bulgarian HTS category better reflected the rectangular steel tube inputs and provided a more reliable basis for valuation. *Id*. This determination was further supported by the absence of record evidence showing that the Bulgarian data were aberrational, distorted, or otherwise unreliable. The Coalition does not contend otherwise.

Commerce's approach is consistent with longstanding precedent sustaining Commerce's use of broader tariff categories where they more accurately reflect the merchandise and provide more reliable data.

*Writing Instrument*, 984 F. Supp. at 640; *Guangdong*, 460 F. Supp. 2d at 1370–71.  The Court has likewise upheld Commerce's reliance on broader surrogate categories where they provide a more reliable dataset, even when narrower categories exist.  *Dorbest*, 462 F. Supp. 2d at 1289–90.  Moreover, Commerce can select broader surrogate categories where they are more contemporaneous or more reflective of market conditions.  *Home Meridian*, 772 F.3d at 1295.  That principle applies here, where Commerce reasonably concluded that the Bulgarian HTS data provided the best available information for valuing rectangular steel tube.

In sum, Commerce evaluated the record evidence, explained its reasoning, and reasonably concluded that the Bulgarian HTS category constituted the most appropriate surrogate value.  Because the Coalition has identified no record evidence undermining that conclusion, and merely asks the Court to reweigh the evidence, Commerce's determination must be sustained.  *Consolo*, 383 U.S. at 620.

IV.    Commerce's Selection of Broader HTS Codes to Value Certain Surrogate Values is Supported by Substantial Evidence and Otherwise in Accordance with The Law

This Court has consistently recognized that Commerce may use broader or differently structured HTS categories where they better reflect the merchandise or provide more reliable data. *See Writing Instrument*, 984 F. Supp. at 640; *Guangdong*, 460 F. Supp. 2d at 1370–71. The Court has likewise upheld Commerce's reliance on broader surrogate categories where they provide a more reliable basis for valuation. *Dorbest*, 462 F. Supp. 2d at 1289–90. Commerce is not required to select the most granular tariff line if it does not improve accuracy or reliability. *Id.* Moreover, when selecting surrogate values and appropriate HTS codes, Commerce may not speculate regarding technical characteristics of inputs not established by record evidence. *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (substantial evidence requires more than speculation).

With respect to Dingli's brake/brake pump inputs, Commerce explained that the brake inputs reported by Dingli consisted of mechanical brake components used in mobile access equipment. The HTS category selected by Commerce, HTS 8708.30, corresponded to

those components based on their physical characteristics and function. SV Memo at 14, Appx___.  Commerce compared the competing HTS descriptions placed on the record and concluded that HTS 8708.30 more accurately reflected the nature of the merchandise than the narrower HTS category proposed by the Coalition.  *Id.*  In the final results, Commerce further explained that the Coalition failed to support, with record evidence, its assertion that the narrower HTS category better matched the brake components used by Dingli.  IDM at 55–56, Appx___-___.

Rather than identifying differences in physical characteristics, composition, or end use, the Coalition relied primarily on the asserted specificity of the narrower HTS code.  Commerce reasonably rejected that argument, explaining that numerical specificity alone does not establish that a tariff category is more appropriate for surrogate valuation purposes.  *Id.*  Consistent with its practice, Commerce focused on whether the HTS category reflected the physical characteristics and commercial identity of the input, not whether it was more finely subdivided.  SV Memo at 14, Appx___.  Based on that analysis, Commerce concluded that the broader HTS category better captured the

49

brake components used in Dingli's production and therefore constituted the best available information.  *Id*.; *see also* IDM at 55-56, Appx___-___.

Here, Commerce articulated a reasoned basis for its selection, grounded in the record and supported by substantial evidence.  Because the Coalition has not identified any evidence demonstrating that Commerce's chosen surrogate value was inaccurate or unreliable, and merely seeks to reweigh the evidence, Commerce's determination must be sustained.  *Consolo*, 383 U.S. at 620.

Similarly, with respect to steel forearm-like shaped steel (steel forearm), Commerce carefully evaluated the competing surrogate value information placed on the record and reasonably concluded that the broader HTS category most accurately reflected the input used by Dingli.  SV Memo at 14–15, Appx___-___; IDM at 56–57, Appx___-___. Specifically, Commerce examined the physical characteristics and function of the steel forearm, including its role in the production of mobile access equipment, and compared those characteristics to the HTS classifications proposed by the parties.  SV Memo at 14–15, Appx___-___.  Commerce explained that the HTS 7326.90 corresponded more closely to the actual merchandise described in the record, whereas

50

the narrower HTS category, HTS 7326.90.94.0000, was either broader or did not clearly capture the input's physical characteristics or level of processing. *Id.* In the final results, Commerce reiterated that the Coalition failed to submit evidence demonstrating that the narrower HTS category more accurately reflected the input at issue. IDM at 56–57, Appx___-___.

Rather than identifying specific physical or functional discrepancies, the Coalition again relied on the asserted numerical specificity of the HTS code. Again, Commerce reasonably rejected that argument, explaining that greater numerical specificity does not, by itself, establish that a tariff category is more appropriate for surrogate valuation purposes. *Id.* Commerce further explained that HTS 7326.90 were not aberrational, distorted, or otherwise unreliable, and that nothing in the record undermined their suitability as a surrogate value. IDM at 57, Appx___.

The Coalition did not contend otherwise. Instead, it simply disagreed with Commerce's evaluation of the competing HTS categories. Such a disagreement does not provide a basis for reversal or remand. Because Commerce articulated a rational explanation supported by

51

record evidence, and because the Coalition has not identified sufficient evidence demonstrating that Commerce's selection was unreasonable, Commerce's determination must be sustained. *Consolo*, 383 U.S. at 620.

Lastly, Commerce's selection of HTS subheading 8536.20 to value Dingli's circuit breaker input was supported by substantial evidence and in accordance with law. As with the other surrogate value determinations addressed above, Commerce evaluated the competing HTS classifications on the record and permissibly concluded that the broader HTS category proposed by Dingli constituted the best available information.

In the preliminary results, Commerce valued Dingli's circuit breaker input using HTS subheading 8536.20, which covers "Automatic circuit breakers for a voltage not exceeding 1,000 V." IDM at 67, Appx___. The Coalition argues that Commerce should instead use HTS subheading 8536.20.10.0019, a narrower 12-digit subheading covering non-household circuit breakers rated below 63 amps. *See* Coalition Br. 36–40. Commerce rejected that argument for two independent and reasonable reasons.

First, Commerce found that the record did not establish that Dingli's circuit breakers fell exclusively within the narrower 12-digit subheading proposed by the Coalition.  IDM at 67–68, Appx___-___.  Although Dingli reported its circuit breaker input as "Circuit breaker – 20A, 125/220V," Commerce reasonably concluded that this description alone was insufficient to establish that the product could not fall within other 8536.20 subcategories, including those covering household or higher-rated breakers.  *Id*.  As Commerce explained, nothing on the record demonstrated that Dingli's circuit breakers were definitively excluded from the broader HTS category.  *Id*.

Second, Commerce reasonably determined that the Coalition failed to demonstrate that its proposed 12-digit subheading was more specific or more appropriate than the broader 6-digit category.  *Id*. at 68, Appx___.  The Coalition asserted that "household" circuit breakers could not apply to mobile access equipment, but did not identify record evidence establishing that the HTS distinction between "household" and "other" circuit breakers turns on the end use of the finished good rather than on technical design features of the breaker itself.  *Id*.  Commerce

thus reasonably concluded that the Coalition's argument rested on assumption rather than record evidence.

Moreover, Commerce reasonably rejected the Coalition's contention that the amperage rating alone dictated classification. While the Coalition argued that Dingli's reported 20-amp breaker necessarily placed it within the sub-63-amp category, Commerce found that the record did not establish whether Dingli's circuit breakers could exceed that threshold in actual use or configuration. IDM at 68, Appx___. As Commerce explained, "there is no record evidence to determine whether Dingli's circuit breaker should be rated above or below 63 amps." *Id*. In the absence of such evidence, Commerce acted reasonably in declining to rely on a narrower HTS category that required assumptions not supported by the record.

Commerce further noted that the Coalition's position would require Commerce to speculate regarding technical characteristics not established by record evidence, precisely what the agency is not permitted to do when selecting surrogate values. *See id.*; *see also OSI Pharms.*, 939 F.3d at 1382 (substantial evidence requires more than speculation). Moreover, Commerce is not required to select the most

specific HTS category possible, but rather the category that provides the most reliable surrogate value based on the whole record. *Home Meridian*, 772 F.3d at 1295.

Here, Commerce reasonably concluded that the broader HTS 8536.20 category best satisfied that standard. The Coalition did not establish that its preferred 12-digit code was more accurate, nor did it demonstrate that the broader category distorted the valuation. Instead, the Coalition merely asserted that a narrower code existed, without substantiating that it was more representative of Dingli's actual input.

Accordingly, Commerce's decision to rely on HTS 8536.20 to value circuit breakers reflects a reasoned evaluation of the record, is consistent with the agency's surrogate value methodology, and is supported by substantial evidence. The Court should therefore sustain Commerce's determination.

V.    Dingli Lacks Standing To Challenge Commerce's Differential Pricing Methodology

This Court should dismiss Dingli's challenge to Commerce's differential pricing methodology for lack of jurisdiction. Before the Court may exercise its judicial power, the party must demonstrate the existence of a case or controversy and the party's standing to litigate.

U.S. Constitution, Art. III, § 1; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016).  Thus, a party invoking this Court's jurisdiction bears the burden of showing that it has constitutional standing.  *See Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1367 (Ct. Int'l Trade 2023) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).  To establish standing, a plaintiff must establish that they have suffered an "injury in fact" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Further, plaintiffs must identify a causal link between the conduct complained of and the injury suffered, and it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision.  *Id.* at 560-561.

Dingli lacks standing to challenge Commerce's application of the Cohen's *d* test because Dingli cannot point to any resulting injury that it has suffered.  Consequently, count four of Dingli's complaint should be dismissed.  *See* Compl. ¶ 25, ECF No. 10.

Commerce typically measures dumping margins either by comparing the weighted average of normal values to the weighted

average of export prices (average-to-average comparison) or by

comparing the normal values of individual transactions to the export

prices of individual transactions (transaction-to-transaction

comparison). *See* 19 U.S.C. § 1677f-1(d)(1)(A). Only when Commerce

identifies a pattern of differential pricing and cannot account for that

pattern using either an average-to-average or a transaction-to-

transaction comparison is Commerce permitted to compare the

weighted average of normal values to the export prices of individual

transactions (average-to-transaction comparison). *Id.* § 1677f-

1(d)(1)(B).

 As part of its determination whether a foreign exporter or

producer exhibits a pricing pattern that differs significantly among

purchasers, producers, or time periods, Commerce employs a statistical

tool, such as Cohen's *d* test. *See Stupp Corp.*, 5 F.4th at 1346-48. The

purpose of the test is ultimately to determine whether to employ an

average-to-average or an average-to-transaction comparison. *Id.* If

Commerce finds from the results of the Cohen's *d* test that a pattern of

differential pricing exists, but that there is no meaningful difference in

the dumping margin calculated using an average-to-transaction as

opposed to an average-to-average methodology, Commerce uses its standard average-to-average methodology to calculate the dumping margin. *Id.* at 1347.

Commerce applied the Cohen's *d* test to Dingli's sales in the final results. IDM at 43, Appx___. Commerce found that, for Dingli, a pattern of differential pricing existed, but that there was no meaningful difference between the dumping margins calculated using the average-to-average and average-to-transaction methods. *Id.* Accordingly, Commerce used the "standard method" – an average-to-average comparison – to calculate Dingli's final dumping margin. *Id.* Therefore, because Commerce ultimately employed the average-to-average method, the Cohen's *d* test had no effect on the method Commerce used to calculate Dingli's dumping margin.

Dingli argues that this Court should order remand for Commerce to recalculate Dingli's margin without using the Cohen's *d* test because the Federal Circuit invalidated "Commerce's … use of the Cohen's *d* test to justify the *average-to-transaction methodology*." Dingli's Br. 56 (citing *Marmen Inc. v. United States*, 134 F.4th 1334, 1348 (Fed. Cir. 2025) (emphasis added)). However, Commerce did not use the average-

to-transaction methodology in the final results.  *See* IDM at 43,

Appx___.  Dingli's reliance on *Marmen* is, therefore, misplaced.

Accordingly, Dingli's claim fails to meet the most basic standing

requirements because Dingli cannot establish that it has suffered injury

because of Commerce's use of the Cohen's *d* test.  Dingli does not

explain how the Cohen's *d* test has caused it even hypothetical (let

alone concrete) harm.  Nor does Dingli explain how the relief that it

seeks from the Court would redress any harm.

In an identical situation, the Court dismissed as non-justiciable a

challenge to the Cohen's *d* test when Commerce employed the test and

concluded that no meaningful difference existed between dumping

margins calculated using the average-to-average and average-to-

transaction methods. *See Best Mattresses*, 622 F. Supp. 3d at 1368.  The

Court determined that any "bare procedural violation" from a pricing

analysis that resulted in the use of the average-to-average method that

the plaintiff preferred did not amount to the sort of concrete harm

necessary to show standing.  *See id.* (quoting *Spokeo*, 578 U.S. at 341).

Similarly, Dingli's lack of injury in this case means that it lacks

standing to challenge Commerce's differential pricing methodology.

Although Commerce employed the Cohen's *d* test, which was invalidated in 2025 after the publication of the final results, that alone does not demonstrate that Dingli suffered an injury.  *Marmen* invalidated Commerce's use of the Cohen's *d* test to justify its use of the average-to-transaction methodology.  *See Marmen*, 134 F.4th at 1348.  Where, as here, Commerce used its standard average-to-average methodology, and did not use the average-to-transaction methodology in the final results, there is no injury.  The results of the Cohen's *d* test had no impact on Dingli's margin.  Count four of Dingli's complaint should be dismissed.

VI.    Commerce's Deduction of Section 301 Duties as U.S. duties from Dingli's U.S. Price is Supported by Substantial Evidence and in <u>Accordance with Law</u>

On August 18, 2017, the President directed the Office of the United States Trade Representative (USTR) to initiate an investigation pursuant to section 301 of the Trade Act of 1974, as amended.  *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Executive Office of the President Aug. 17, 2017); *see* 19 U.S.C. § 2411.  After a notice and comment period, USTR determined that "the acts,

policies, and practices of the Government of China related to technology

transfer, intellectual property, and innovation covered in the

investigation are unreasonable or discriminatory and burden or restrict

U.S. commerce." *Notice of Determination and Request for Public*

*Comment Concerning Proposed Determination of Action Pursuant to*

*Section 301*, 83 Fed. Reg. 14,906, 14,906 (U.S. Trade Rep. Apr. 6, 2018).

As a result, pursuant to sections 301(b) and (c) of the Trade Act,

USTR proposed an "additional duty of 25 percent" on certain goods of

Chinese origin and included a list of tariff subheadings for the products

of Chinese origin that would be covered by this action. *Id.* at 14,907-54.

On June 20, 2018, USTR implemented "an additional ad valorem

duty of 25 percent" on a subset of the products already identified in the

April 6 notice and proposed to extend the additional 25 percent tariff to

an additional tranche of products of Chinese origin. *Notice of Action*

*and Request for Public Comment Concerning Proposed Determination of*

*Action Pursuant to Section 301*, 83 Fed. Reg. 28,710, 28,711-12 (U.S.

Trade Rep. June 20, 2018). On August 16, 2018, USTR implemented

section 301 duties of "an additional ad valorem duty of 25 percent" to

most of the products identified in the June 20 notice. *Notice of Action*

*Pursuant to Section 301*, 83 Fed. Reg. 40,823, 40,824 (U.S. Trade Rep. Aug. 16, 2018).  On September 18, 2018, USTR imposed "additional duties" on another tranche of Chinese products.  *See Notice of Modification in Section 301 Action*, 83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 18, 2018).  There is no dispute that Section 301 duties were in effect during the period of review and that Dingli's reported U.S. prices were inclusive of the Section 301 duties.  *See* IDM at 44; *see also* Dingli's Brief at 57.

The statute requires Commerce to reduce export price by an amount attributable to United States import duties.  19 U.S.C. § 1677a(c)(2)(A).  The Federal Circuit has held that certain duties imposed pursuant to section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862), constitute United States import duties that should be deducted from the U.S. price.  *Borusan*, 63 F.4th at 36-37.  By contrast, the Federal Circuit previously held that safeguard duties imposed pursuant to section 201 of the Trade Act are not normal United States import duties and that they should not be deducted from the U.S. price.  *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1365-67 (Fed. Cir. 2007).

In this review, Commerce found that section 301 duties are United States import duties. Because section 301 duties were assessed on Dingli's imports of the subject merchandise during the POR, Commerce deducted the duties from Dingli's U.S. sales prices. IDM at 44, Appx___. Commerce found that section 301 duties are intended to address broad, national concerns, and that harm from imports is not a prerequisite for the imposition of section 301 duties. *Id.* Pursuant to its findings in other proceedings, Commerce also found that section 301 duties are distinct from antidumping, countervailing, and section 201 duties, which are special duties "'imposed to address the specific threat of injury or actual injury to a domestic industry as a result of imported merchandise.'" *See id.* at 44-45, Appx___-___.

The Federal Circuit's opinion in *Borusan*, and the Court's opinion in *Shanghai Tainan*, further support Commerce's determination in this respect. *See Borusan*, 63 F.4th at 34; *Shanghai Tainai*, 658 F. Supp. 3d at 1292. In *Borusan*, the Federal Circuit found that a reading of the instrument enacting the section 232 duties in question indicated that the duties were intended to be applied in addition to, not in lieu of, antidumping duties. *Borusan*, 63 F.4th at 34 (citing Proclamation

63

9705, 83 Fed. Reg. 11,625 (Mar. 15, 2018)).  The Federal Circuit

therefore concluded, based on that finding, that:

> Producing that result requires the antidumping
> duty to be calculated as if the Proclamation 9705
> duty did not exist—i.e., by subtraction of the
> Proclamation 9705 duty from the U.S. price if the
> Proclamation 9705 duty is built into it.  Otherwise,
> the Proclamation 9705 duty would be offset
> substantially or completely by a reduction in the
> antidumping duty itself (through an increase in
> the U.S. price and therefore a decrease in the
> dumping margin), defeating the evident "in
> addition to" prescription of Proclamation 9705.

*Id.*  The court also recognized that the deduction of section 232 duties

from U.S. price do not present the same "double-counting" issue as the

deduction of antidumping duties from U.S. price.  *Id.* at 35 (citing

*APEX Exps. v. United States*, 777 F.3d 1373, 1379 & n.2 (Fed. Cir.

2015)).  The Federal Circuit added that, with respect to deducting the

section 232 duties declared by Proclamation 9705, "there is no

immediately evident circularity problem."  *Id.*  Finally, the court

rendered its decision solely on its analysis of the text of Proclamation

9705, and not on any further analysis of section 232 duties more

generally or on any distinction between "normal" and "special" U.S.

import duties.  *Id.*

This Court extended *Borusan*'s reasoning to the section 301 context, holding that:  *Borusan* instructs that the text of the legal instrument enacting duties is of paramount importance when determining the correct classification of those duties; if the legal instrument enacting those duties provides that those duties are to be assessed in addition to antidumping duties, then it is reasonable for Commerce to treat those duties as "United States Import Duties"; and that the section 301 duties imposed by the *Notice of Action* are intended to be assessed in addition to antidumping duties.  *Shanghai Tainai*, 658 F. Supp. 3d at 1292; *see also Neimenggu Fufeng*, 741 F. Supp 3d at 1379-83 (relying upon *Borusan*'s reasoning to hold Commerce's deduction of 301 duties from U.S. sales prices lawful).  The section 301 duties deducted from Dingli's U.S. prices, which likewise stem from the *Notice of Determination Pursuant to Section 301*, were intended to be assessed in addition to antidumping duties, and the Court's conclusions in *Shanghai Tainai* and *Neimenggu Fufeng*, which flows from the Federal Circuit's holding in *Borusan*, should apply equally here.

65

Dingli argues that deducting section 301 duties from its U.S. price improperly "double-counts" those duties. *See* Dingli Br. 65-66. But Dingli's argument conflates the double-counting of antidumping duties, which produces a "spiraling circularity," *see Borusan*, 63 F.4th at 35, with the double-counting of section 301 duties. Section 301 duties cannot be "double-counted" in a dumping margin calculation because they are distinct from the duty Commerce is seeking to assess. What Dingli refers to as "double-counting" is simply the imposition of section 301 duties in addition to antidumping duties, which is an intended result of the proclamation enacting the section 301 duties and is therefore an appropriate outcome. The contrary result, which Dingli seeks, would effectively result in non-collection of section 301 duties in the form of a lowered dumping margin. Such an outcome would defeat the purpose of the section 301 duties. *See Borusan*, 63 F.4th at 35 (finding that failing to deduct duties intended to be in addition to antidumping duties is improper and would defeat the intended prescription of the duties).

Dingli also argues that Commerce failed to adequately distinguish the section 301 duties applied to its imports of certain

mobile access equipment and subassemblies thereof from section 201 safeguard duties, which cannot be considered United States import duties under the statute.  Dingli Br. 57-64; *see Wheatland Tube*.  But Dingli's argument rests on an analysis of the remedial intent of the statutory provisions implementing the duties, rather than whether the actual duties implemented are intended to be assessed in addition to antidumping duties.  The Federal Circuit, and this Court, held that the latter is the relevant consideration when determining whether duties should be deducted from U.S. price.  *See Borusan*, 63 F.4th at 34- 35; *see also Shanghai Tainai*, 658 F. Supp. 3d at 1292.  Moreover, analysis of the intent of the relevant legal instrument, rather than an analysis of whether duties are "special" or "normal" United States import duties, is sufficient to sustain a Commerce determination to deduct duties from U.S. price.  *Borusan*, 63 F. 4th at 35.  The Court should follow the reasoning set forth in *Shanghai Tainai* and find that section 301 duties are United States import duties pursuant to 19 U.S.C. § 1677a(c)(2)(A) and find that Commerce's determination to deduct those duties is supported by substantial evidence and in accordance with law.

## CONCLUSION

For these reasons, the Court should deny plaintiffs' motions for judgment on the agency record and sustain Commerce's final results in its entirety.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

| | |
|---|---|
| OF COUNSEL | s/ Kristin E. Olson |
| | KRISTIN E. OLSON |
| CHARLIE CHUNG | Trial Attorney |
| Attorney | U.S. Department of Justice |
| Office of the Chief Counsel for | Civil Division |
| Trade Enforcement & | Commercial Litigation Branch |
| Compliance | P.O. Box 480 |
| U.S. Department of Commerce | Ben Franklin Station |
| | Washington, D.C. 20044 |
| | Tel: (202) 307-6299 |
| | kristin.olson@usdoj.gov |

March 4, 2026                    *Attorneys for the United States*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the 21,000 word limitation authorized by the Court's scheduling order because the brief 11,928 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

I also certify that this submission was not prepared with the assistance of a generative artificial intelligence program based on natural language prompts—such as, but not limited to, ChatGPT or Google Bard.

<u>s/ Kristin E. Olson</u>

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERES OF MOBILE ACCESS EQUIPMENT,<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNITED STATES,<br><br>     Defendant,<br><br>   and<br><br>   ZHEJIANG DINGLI MACHINERY CO., LTD.,<br><br>     Defendant-Intervenor. | Court No. 24-00219 |
| ZHEJIANG DINGLI MACHINERY CO., LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNITED STATES,<br><br>     Defendant,<br><br>   and<br><br>COALITION OF AMERICAN MANUFACTURERES OF MOBILE ACCESS EQUIPMENT,<br><br>    Defendant-Intervenor. | Court No. 24-00221 |

<u>ORDER</u>

Upon consideration of consolidated plaintiffs' motions for judgment upon the agency record, defendant's and defendant-intervenors' responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are denied, and it is further

ORDERED that judgment is entered in favor of the United States.

_____
                                    Hon. M. Miller Baker, Judge

Dated: _____
         New York, NY

71