# UNITED STATES COURT OF INTERNATIONAL TRADE

# BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

_____
:
COALITION OF AMERICAN
MANUFACTURERS OF MOBILE
ACCESS EQUIPMENT,                        :

      Plaintiff,                         :    Court No. 24-00219

      v.                                 :

UNITED STATES,                           :

      Defendant,                         :

      and                                :

ZHEJIANG DINGLI MACHINERY
CO., LTD.,                               :

      Defendant-Intervenor.              :
_____
:

## DEFENDANT-INTERVENOR DINGLI'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2

Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

*599 Lexington Ave., 36th Floor
New York, New York 10022

(212) 557-4000
**

1201 New York Ave., NW,
Suite 650
Washington, DC 20005

*Counsel for Defendant-Intervenor Zhejiang Dingli Machinery Co., Ltd.*

Dated: April 23, 2026

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................ii

GLOSSARY .................................................................................................. iii

ARGUMENT ................................................................................................2

I.    COMMERCE LAWFULLY VALUED CERTAIN INPUTS WITH
BULGARIAN DATA RATHER THAN TURKISH DATA ...............2

    A.    Commerce Reasonably Valued Motor Controllers.................8

    B.    Commerce Reasonably Valued Hot-Rolled and Cold-Rolled
Steel Tubes .............................................................................12

    C.    Commerce Reasonably Valued Rectangular Steel Tubes ....14

II.    COMMERCE LAWFULLY SELECTED BROADER HTS CODES
TO VALUE CERTAIN INPUTS ...................................................16

    A.    Commerce Reasonably Selected HTS 8708.30 to Value
Dingli's Brakes ......................................................................17

    B.    Commerce Reasonably Selected HTS 7326.90 to Value
Dingli's Steel Forearm Articles ............................................19

    C.    Commerce Reasonably Selected HTS 8536.20 to Value
Dingli's Circuit Breaker.......................................................23

CONCLUSION .................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) .................................8

*Goldlink Indus. Co. v. United States*, 30 CIT 616 (2006) ........................4

*Peer Bearing Co-Changshan v. United Stales*, 804 F. Supp. 2d 1338
(CIT 2011) ...............................................................................................3

*Tianjin Magnesium Int'l Co. v. United States*, 2026 WL 711052
(CIT 2026) ...............................................................................................4

**Regulations**

19 C.F.R. § 351.301.................................................................................5

19 C.F.R. § 351.408.................................................................................2

**Statutes**

19 U.S.C. § 1677............................................................................2, 3, 11

**Administrative Decisions**

*Certain Mobile Access Equipment and Subassemblies Thereof from the
People's Republic of China: Final Results of Antidumping Duty
Administrative Review, 2023-2024*, 91 Fed. Reg. 20,401 (Apr. 16, 2026)
...................................................................................................................19

*Certain Steel Nails from the People's Republic of China; Final Results of
Third Antidumping Duty Administrative Review; 2010-2011*,
78 Fed. Reg. 16,651 (Mar. 18, 2013) .....................................................3

*Steel Wire Garment Hangers from the People's Republic of China:
Final Results of Antidumping Duty Administrative Review,
2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013).................................22

## GLOSSARY

| Abbreviation | Term |
|---|---|
| Coalition of American Manufacturers of Mobile Access Equipment | Coalition/Petitioner |
| Harmonized Tariff Schedule | HTS |
| Issues and Decision Memorandum | IDM |
| Mobile access equipment | MAE |
| New factual information | NFI |
| People's Republic of China | China/ PRC |
| Public Record | P.R. |
| Surrogate value | SV |
| Integrated Tariff of the European Union | TARIC |
| U.S. Department of Commerce | Commerce/ Department |
| Zhejiang Dingli Machinery Co., Ltd. | Dingli |

This Response Brief is filed on behalf of Defendant-Intervenor Zhejiang Dingli Machinery Co., Ltd. ("Dingli"), in opposition to the Motion for Judgment on the Agency Record filed by Plaintiff Coalition of American Manufacturers of Mobile Access Equipment ("Coalition" or "Petitioner") on August 11, 2025, ECF 34 ("Pet. Br."), challenging aspects of the U.S. Department of Commerce's ("Commerce" or "Department") final results in its first administrative review, covering February 13, 2022, to March 31, 2023, of the antidumping duty order on certain mobile access equipment and subassemblies thereof ("MAE") from the People's Republic of China ("China" or "PRC"), *MAE from China: Final Results of Antidumping Duty Administrative Review; 2022-2023,* 89 Fed. Reg. 88,730 (Nov. 8, 2024), P.R. 298, Appx____ ("*Final Results*"), and accompanying Issues and Decision Memorandum (Nov. 4, 2024) ("IDM"), P.R. 294, Appx____.

Dingli fully supports the position of Defendant United States ("Defendant") in opposition to Petitioner's arguments in its Response Brief filed on March 4, 2026, ECF 41 ("Def. Br."). Dingli provides the following supplemental points in support of those made by Defendant in defending certain aspects of the *Final Results.* Def. Br. at 19-67.

1

## ARGUMENT

**I.   COMMERCE LAWFULLY VALUED CERTAIN INPUTS WITH BULGARIAN DATA RATHER THAN TURKISH DATA**

The Coalition argues that Commerce's valuation of certain inputs based on 8-digit Harmonized Tariff Schedule ("HTS" or "HS") codes from Bulgaria, a secondary surrogate country, instead of 12-digit HTS codes from Turkey, the primary surrogate country, is not supported by substantial evidence and contrary to law. Pet. Br. at 14-15. However, Dingli fully concurs with Defendant's demonstration that "Commerce's decision to use Bulgarian HTS codes for 8538.90.91, 7304.39.82, and 7306.61.99 to value Dingli's motor controllers, hot-rolled and cold-rolled steel tubes, and rectangular steel tubes, respectively, was reasonable, supported by substantial evidence, and fully consistent with section 19 U.S.C. § 1677b(c)." Def. Br. at 37.

To support Turkish 12-digit HTS over Bulgarian 8-digit HTS subheadings for valuing all three inputs at issue, the Coalition advances certain common arguments, which, as set forth below, are unsupported by substantial record evidence and are contrary to controlling law.

First, citing 19 C.F.R. § 351.408(c)(2), the Coalition supports

2

surrogate values ("SV") from the primary surrogate country Turkey, based on Commerce's regulatory preference to value all inputs in a single surrogate country. Pet. Br. at 9-10. However, the Coalition overlooks that such regulatory preference is conditional on the competing data sets being of equal quality, which is not supported on this record. *Certain Steel Nails from the People's Republic of China; Final Results of Third Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 16,651 (Mar. 18, 2013), IDM Comment I.D.d ("As the court pointed out in *Pear Bearing*, from a single country could support a choice of data as the best available information where the other available data 'upon a fair comparison, are otherwise seen to be fairly equal.'") (quoting *Peer Bearing Co-Changshan v. United Stales*, 804 F. Supp. 2d 1338, 1353 (CIT 2011)).

Moreover, such regulatory preference is subordinate to the statutorily mandated "best available information" standard. 19 U.S.C. § 1677b(c)(1)(B). Indeed, the Coalition unwittingly argues that "'product specificity logically must be the primary consideration in determining best available information.'" Pet. Br. at 10 (citation omitted). This acknowledgment is at odds with its conclusory and unsupported

3

assertion that Turkish 12-digit HTS subheadings "were equally or more specific to the inputs in question than competing" 8-digit Bulgarian HTS subheadings. *Id.* at 10-11.

Ultimately, the Coalition fails to impugn Commerce's determination as unreasonable. "When reviewing a determination by Commerce, the 'court's duty is "not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."''' *Tianjin Magnesium Int'l Co. v. United States*, 2026 WL 711052, *3 (CIT 2026) (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619 (2006)).

Second, the Coalition advances a meritless claim based on data presentation. According to the Coalition, it "represented to Commerce that it had placed on the record 'Turkish import data for <u>all</u> HS subheadings proposed by Dingli at the six-digit level as well as <u>every</u> HS subheading at the 12-digit level comprising the six-digit heading.'" Pet. Br. at 17 (emphasis in original) (quoting Letter from Wiley Rein to Commerce (Apr. 11, 2024), P.R. 411, ("Coalition Pre-Prelim Comments"), at 20, Appx____). This claim appears to be an

4

afterthought, otherwise unsupported by substantial record evidence, and should be rejected for several reasons.

As an initial matter, the Coalition's final SV comments lack any factual statement purporting to submit SV data for all of the 12-digit Turkish HTS subheadings reported under the corresponding 6-digit HTS subheadings. *See* Petitioner Final SV Submission (Mar. 27, 2024), PR 213-20, Exhibit 3-F ("Master SV Data"), Appx____-____. Instead, weeks later the Coalition advanced this claim for the first time in its Pre-Preliminary Comments, which thereby constituted untimely new factual information ("NFI"). Coalition Pre-Prelim Comments at 20, Appx____; 19 C.F.R. § 351.301(c)(3)(ii). Had the Coalition disclosed this NFI in its March 27, 2024, Final SV Submission, Dingli could have been afforded a chance to submit rebuttal NFI. Thus, this untimely NFI should be rejected. Moreover, Dingli echoes the Defendant that as proper evidentiary support, instead of self-created Excel sheets, the Coalition should have submitted "relevant excerpts {in PDF} from the Turkish tariff schedule containing the entire 12-digit HS breakouts under the six-digit HS but failed to do so." Def. Br. at 39; *see* IDM at 47.

Third, the Coalition erroneously argues that the "12-digit Turkish

HTS data . . . were specific to the input in question, {unlike the} more general . . . 8-digit Bulgarian HTS codes." Pet. Br. at 14. The Coalition claims that "Turkey and Bulgaria subscribe to a common classification system and thus share HTS categorizations to at least the 8-digit level." *Id*. at 14-15, n.2. The Coalition concludes that the "Turkish customs nomenclature is therefore identical to Bulgaria's down to at least the 8-digit level and likely to the 10-digit level." *Id*. at 19.

However, these claims are unsupported by record evidence because the purportedly complete Turkish HS subheadings that the Coalition claims it placed on the record do not have any 8-digit or 10-digit HTS breakouts. See Petitioner Final SV Submission Exhibit 3F, Appx____-____. Therefore, contrary to Coalition's arguments, the record does not contain Turkish HTS subheadings at 8-digit levels corresponding to the Bulgarian 8-digit HTS subheadings. As such, there is no record support for the Coalition's claims that Integrated Tariff of the European Union ("TARIC") "codes are harmonized and thus identical to at least the 8-digit level." Pet. Br. at 21. Further, absent conclusive evidence that the record contains all 12-digit Turkish HTS subheadings corresponding to the Bulgarian 8-digit HTS subheadings,

6

there is no merit to the Coalition's assertion that their proposed Turkish 12-digit HTS subheadings are more product-specific.

Fourth, the Coalition advances a presumptive argument lacking evidentiary support: "Given their language differences, it is not unexpected that the two countries may <u>translate</u> subheadings differently {but} . . . {t}his does not alter the fact that the tariff codes cover the same merchandise." Pet. Br. at 19-20 (emphasis in original). It is well-established that the tariff descriptions of HTS subheadings are controlling with regard to their scope and any HTS harmonization is limited up to 6-digit HTS subheadings. *See e.g.*, Pet. Br. at 21.

Fifth, Dingli agrees with the Defendant's position that "the mere fact that the 12-digit code is more specific does not render it more appropriate than a 6- or 8-digit code . . . {since} Commerce may rely on broader tariff categories where they provide more reliable or representative data." Def. Br. at 41. This position is supported by a plethora of judicial precedents. *See id.* at 41-42.

Finally, the Coalition's claims should also be rejected because they amount to nothing more than asking "the Court {to} reweigh the evidence, which it may not do." Def. Br. at 42 (citing *Consolo v. Fed.*

7

*Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

Beyond this general demonstration that Commerce properly valued the inputs challenged by Petitioner, Dingli establishes below that Commerce lawfully valued: (a) motor controllers; (b) hot rolled and cold rolled steel tubes; and (c) rectangular steel tubes.

### A.   Commerce Reasonably Valued Motor Controllers

The Coalition argues that Commerce erred in valuing motor controllers under Bulgarian HTS 8538.90.91 instead of Turkish HTS 8538.90.91.00.00. Pet. Br. at 15-22. As explained below, this Coalition position is unsupported by substantial record evidence.

First, the Coalition misplaces reliance on the HTS subheading digit counts. According to the Coalition, the "12-digit Turkish HTS code (8538.90.91.00.00) that covers 'parts for electrical apparatus for electrical circuits, boards, panels etc. for electric control or distribution of electricity, {not elsewhere specified or included}: other assembled electronic components and parts'" is "the same" as the "8-digit Bulgarian HTS code (8538.90.91) that covers 'electronic assemblies for electrical apparatus.'" Pet. Br. at 15-16. The Coalition reasons that because "a code ending in '00.00' represents a subheading that does not

8

get any more specific," Commerce should have selected the equally product-specific Turkish 12-digit HTS subheading. *Id.* at 16. Contrary to the Coalition's arguments, the Turkish 12-digit HTS subheading is not as product-specific as the Bulgarian 8-digit HTS subheading.

Dingli's motor controller input is described as follows:

{T}he input in question "provides proportional output voltage to drive motors and power unit motor{}.". . . {Motor controllers} are smaller parts and are used as constituents of the larger and more sophisticated control panels or boards.

IDM at 49, Appx_____ (quoting Commerce Preliminary SV Memorandum (Apr. 26, 2024), P.R. 250-51 ("Prelim SV Memo"), at 11, Appx_____).

Contrary to the Coalition's proffered truncated description, the full description of Bulgarian HTS 8538.90.91, is as follows:

Electronic Assemblies For Electrical Apparatus For Switching Or Protecting Electrical Circuits, Or For Making Connections To Or In Electrical Circuits Of Heading 8535 Or 8536 And For Control Desks, Cabinets And Similar Combinations Of Apparatus Of Heading 8537 (excl. for wafer probers of subheading 8536.90.20)

Prelim SV Memo Attachment I Tab: "Master BUL," Appx_____.

Conversely, the Coalition's proffered expansive description is contradicted by the full description of the Turkish HTS 8538.90.91.00.00: "Other Assembled Electronic Components and Parts."

9

Petitioner Final SV Submission, accompanying Excel Workbook Tab: "Ex 3F – Master SVs", Row 864, Appx____.

The Coalition's additional prefix to Turkish HTS 8538.90.91.00.00 actually pertains to the description of the harmonized 6-digit HS 8538.90: "parts for electrical apparatus for electrical circuits, boards, panels etc. for electric control or distribution of electricity, {not elsewhere specified or included}." *Id.* at Tab "Ex 3F – Master SVs", Row 164, Appx____.

Further, the Coalition's argument that the Turkish HTS 8538.90.91.00.00 was the sole 12-digit HTS subheading under Turkish HTS 8538.90.91 is unsupported by substantial record evidence. As established *supra*, there is no evidentiary support for the Coalition's claim that it "had placed on the record Turkish import data for . . . every HS subheading at the 12-digit level." Pet. Br. at 17.

Accordingly, the record evidence fails to support the Coalition's claim that the descriptions under the Bulgarian 8-digit HTS and Turkish 12-digit HTS subheading are the same. Consequently, the Coalition fails to impugn Commerce's findings that:

> (2) the differing descriptions for competing HS categories challenge the petitioner's claim that the product coverage

10

under Turkish HS subheading 8538.90.91.0000 is identical to that under Bulgarian HS 8538.90.91; and (3) direct evidence that Dingli's motor controller is a small electronic part that is used as a component of a large and sophisticated control panel or board, making the coverage thereof specific under HS subheading 8538.90.91, while suspect under HS subheading 8538.90.91.0000 ("other assembled electronic components and parts)."

IDM at 49, Appx____.

To reiterate, the Bulgarian HTS 8538.90.91, although from a secondary surrogate country, is, unlike the Turkish HTS 8538.90.91.00.00, product-specific. The Bulgarian HTS covers a well-defined group of specific electronic components based on their end-uses (*e.g.*, switching or protecting or for making connections in electrical circuits). As such, Commerce's choice is favored by product-specificity, the single most important criteria under the statutory "best available information" standard. 19 U.S.C. § 1677b(c)(1)(B).

Second, the Coalition's subsidiary argument speculates that the Turkish HTS 8538.90.91.00.00 is equivalent to the Bulgarian HTS 8538.90.91. The Coalition reasons that "a subheading ending in '0000' universally indicates the absence of further breakout codes." Pet. Br. at 17. Such reasoning is speculative absent unambiguous evidence that all Turkish 12-digit HTS subheadings corresponding to the Bulgarian 8-

11

digit HTS subheadings are on the record, as established *supra.*

Third, the Coalition again speculates without substantial evidence in challenging Commerce's findings that the "proposed HTS subheadings cover different merchandise . . . because one goes to the 12-digit level and their narrative descriptions differ." Pet. Br. at 20. There is no basis to find "that these TARIC system subheadings are definitionally equivalent." *Id.* at 18.

In sum, the Coalition fails to dislodge Commerce's rational explanation grounded in record evidence for selection of the Bulgarian HTS 8538.90.91. Therefore, this Court should reject the Coalition's invitation to reweigh the evidence.

### B.   Commerce Reasonably Valued Hot-Rolled and Cold-Rolled Steel Tubes

The Coalition argues that Commerce erred in valuing hot-rolled and cold-rolled steel tubes under the Bulgarian HTS 7304.39.82 instead of the Turkish HTS 7304.39.82.9000. Pet. Br. at 22-26. As explained below, the Coalition's arguments are unsupported by substantial record evidence.

The Coalition argues that "the Bulgarian {HTS 7304.39.82} data . . . was not from the primary surrogate country, and . . . also

12

overbroad." Pet. Br. at 23. The Coalition asserts that "only two HTS subheadings exist in Turkey under HTS 7304.39.82 . . . : (1) HTS 7304.39.82.1000, which covers tube for use in civil aircraft and (2) HTS 7304.39.82.9000, which covers tube not for use in civil aircraft." *Id*. Based on this premise, the Coalition makes a two-fold argument: "8-digit Bulgarian code {HTS 7304.39.82} was at least equivalent to the two 12-digit Turkish codes on the record," and inferior to (*i.e.*, less specific than) the 12-digit Turkish code {HTS 7304.39.82.9000} . . . that excluded irrelevant aircraft tube." *Id*. at 26. These recycled arguments were thoroughly addressed by Commerce. IDM at 49-50, Appx____-____. Petitioner fails to advance any new or compelling rationale to support its argument, as explained below.

The Coalition's central premise that there are only two 12-digit breakouts under the Turkish HTS 7304.39.82 is speculative and unsupported by record evidence, as already explained *supra*. Accordingly, the Coalition continues to fail to support by record evidence its "claim that, as compared to the Bulgarian HS subheading 7304.39.82, the Turkish HS subheading 7304.39.82.9000 is relatively more specific {to} the input, as it excludes pipe for civil air vehicles

13

covered in HS subheading 7304.39.82.1000." IDM at 50, Appx____.

Therefore, Commerce reasonably found that: "Because it is not known whether Turkish HS subheading 7304.39.82 may contain an additional 12-digit breakout that is specific to the input, the petitioner's proposed residual Turkish HS subheading 7304.39.82.9000 may not, thus, be specific to the input." *Id.*

Conversely, the Coalition's challenge to the Bulgarian HTS 7304.39.82 are limited to it being overbroad and from a secondary surrogate country – neither of which is disqualifying. The Coalition fails to persuade how Commerce erred in preferring a purportedly overbroad 8-digit HTS subheading, notably satisfying the product specificity criteria, over a 12-digit HTS that potentially is not product-specific. Likewise, the Coalition fails to articulate how Commerce erred by preferring a superior SV data from a secondary surrogate country. As such, this Court should reject the Coalition's invitation to reweigh evidence.

### C.    Commerce Reasonably Valued Rectangular Steel Tubes

The Coalition argues that Commerce erred in valuing rectangular steel tube under the Bulgarian HTS 7306.61.99 instead of the Turkish

14

HTS 7306.61.99.9000. Pet. Br. at 26-28. As explained below, the Coalition's arguments are unsupported by substantial record evidence.

The Coalition's central premise is that the "Turkish HTS subheading 7306.61.99 breaks out into just two 12-digit codes: one for use in civil aircraft (7306.61.99.10.00) and one for other tubes (7306.61.99.9000)." *Id.* at 26. From this premise, they conclude that "{b}ecause mobile access equipment still is not civil aircraft, . . . only the latter {*i.e,.* HTS 7306.61.99.9000} could apply." *Id.* at 26-27. However, this argument was properly rejected by Commerce because "{t}here is no record evidence that only two Turkish 12-digit breakouts, 7306.61.99.1000 and 7306.61.99.9000, comprise parent HS subheading 7306.61.99." IDM at 53, Appx____. There is no evidentiary support for the Coalition's retort that it "informed Commerce that it had placed all Turkish 12-digit subheadings on the administrative record." Pet. Br. at 27.

Consequently, the Coalition fails to impugn Commerce's rejection of Turkish data as lacking product-specificity. "Because it is not known whether Turkish HS 7306.61.99 may contain an additional subheading 12-digit breakout that is specific to the input, {the} residual Turkish HS

7306.61.99.90.00 may not, thus, be specific to the input." IDM at 53, Appx____.

Conversely, the Coalition fails to impeach Commerce's selection of 8-digit Bulgarian HTS 7306.61.99 on product-specificity considerations. The Bulgarian HTS code undisputedly covers the input. As such, the Coalition fails to persuade how Commerce erred by preferring a superior SV data from a secondary surrogate country. Accordingly, this Court should again reject the Coalition's invitation to reweigh evidence.

## II.  COMMERCE LAWFULLY SELECTED BROADER HTS CODES TO VALUE CERTAIN INPUTS

The Coalition argues that for valuing three inputs – brakes, steel forearm articles and circuit breakers – Commerce erred in rejecting "12-digit Turkish HTS data that were specific to the input in question, {in favor of} more general, 6-digit Turkish HTS codes." Pet. Br. at 29. As explained in turn below, the Coalition's arguments are unsupported by substantial record evidence because Commerce properly selected: (a) HTS 8708.30 to value Dingli's brakes; (b) HTS 7326.90 to Value Dingli's Steel Forearm Articles; and (c) HTS 8536.20 to value Dingli's circuit breaker.

16

### A. Commerce Reasonably Selected HTS 8708.30 to Value Dingli's Brakes

The Coalition argues that Commerce erred in valuing Dingli's brakes. It challenges the valuation of "Dingli's brakes input using Turkish HTS subheading 8708.30, which covers 'Brakes And Servo-Brakes; Parts Thereof,' and reject{ing} Petitioner's suggestion of 8708.30.10.0000, covering 'Brakes And Servo-Brakes; Parts Thereof: Brakes and Servo Brakes and Parts of Motor Vehicles, Tractors, and Motor Cultivators for Special Purpose, Carrying Goods, and Carrying People.'" Pet. Br. at 29-30 (quoting IDM at 55, Appx____). As explained below, the Coalition's arguments are speculative and unsupported by substantial record evidence.

First, Commerce properly found "that there is no record evidence that five Turkish 12-digit breakouts comprise parent HS 8708.30 ... HS 8708.30 may contain an additional 12-digit breakout that is specific to the input, {and, accordingly} the petitioner's proposed HS 8708.30.10.00.00 may not, thus, be specific to the input." IDM at 56, Appx____. The Coalition asserts that "Commerce's factual premise was incorrect because all Turkish 12-digit subheadings were on the record." Pet. Br. at 32. Once again, this argument should be rejected as

17

unsupported by substantial record evidence, as established *supra*.

Second, the Coalition unpersuasively makes a conclusory assertion based on subheading language. According to the Coalition, "the 'verbiage of HS 8708.30.10.00.00,' . . . easily encompasses mobile access equipment on its face", reasoning that its scope defines "mobile access equipment as merchandise consisting of a mobile chassis with a lifting device 'for mechanically lifting persons, tools and/or materials' and other components." Pet. Br. at 32-33 (quoting IDM at 55-56, Appx____-____). However, the Coalition side-steps tying any product in the verbiage of HS 8708.30.10.00.00 with MAE.

Accordingly, the Coalition's arguments are presumptive and fail to impugn Commerce's findings that "it is speculative to assume that the verbiage of HS 8708.30.10.00.00 description ('Motor Vehicles…for Special Purpose, Carrying Goods, and Carrying People') necessarily encapsulates MAE." IDM at 56, Appx____. Specifically, the Coalition has failed to establish that MAE qualifies as special purpose vehicles, or categorized as vehicles carrying goods or people. Commerce's finding that "MAE . . . is not a cargo trolley" in the recently concluded second review of MAE from China is instructive as it confirms that MAE are

18

distinct from cargo carrying vehicles. *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2023-2024*, 91 Fed. Reg. 20,401 (Apr. 16, 2026), IDM Comment 25.

Therefore, contrary to the Coalition's assertions, HTS 8708.30.10.00.00 is not supported by product-specificity criteria. In sum, absent requisite evidence that HTS 8708.30 contains only five 12-digit breakouts, together with the fact that HTS 8708.30.10.00.00 is demonstrably not product-specific, the Coalition fails to undermine Commerce's findings "that the record is not clear whether a more segregated HS category 8708.30.10.00.00 achieves further specificity to the input in question than HS category 8708.30". IDM at 56, Appx____. This Court should accordingly reject the Coalition arguments that when valuing Dingli's brakes, "Commerce dismissed subheading 8708.30.10.00.00 based on factual error, and inadequately explained its resulting determination that a 6-digit parent code . . . was the best information available." Pet. Br. at 33.

### B. Commerce Reasonably Selected HTS 7326.90 to Value Dingli's Steel Forearm Articles

The Coalition challenge Commerce's valuation of Dingli's steel

19

forearm articles. It argues that "Commerce's determination to use a 6-digit subheading {HTS 7326.90 – 'Articles Of Iron Or Steel'} to value Dingli's steel forearm articles, in lieu of Petitioner's proffered 12-digit breakout, {HTS 7326.90.98.0019 – 'Other articles of iron or steel,'} should be remanded." Pet. Br. at 33; IDM at 57, Appx____. As explained below, the Coalition's arguments are unsupported by substantial record evidence.

First, the Coalition again mistakenly claims that the record contains all 12-digit HTS breakouts. It argues that of "all the 12-digit breakouts under that subheading {HTS 7326.90}, only one could apply: 7326.90.98.0019," reasoning that all other 12-digit breakouts covered either "forged or sintered articles of iron or steel" or "facially inapplicable goods like ladders," etc. Pet. Br. at 33-34. Yet once more this recycled argument that the record contains all 12-digit HTS breakouts is unsupported by substantial record evidence. Therefore, the Coalition fails to impugn Commerce's findings that because "HS 732690 may contain an additional 12-digit breakout, not provided on the record, that is specific to the input, the petitioner's proposed HS 7326.90.98.0019 may not, thus, be specific to the input." IDM at 57,

20

Appx____.

Second, the Coalition engages in conjecture as to product-specificity. It argues that Commerce's selected "6-digit code {HTS 7326.90} was thus necessarily overbroad because it included numerous facially inapplicable breakouts, whereas Petitioner's 12-digit code {HTS 7326.90.98.0019} was both applicable and more specific." Pet. Br. at 34. This argument is speculative because while HTS 7326.90.98.0019 "Other articles of iron or steel" is a residual, non-specific and broad basket category that potentially "may entirely remove Dingli's input from being encompassed by" it, "HS 732690 may contain an additional 12-digit breakout, not provided on the record, that is specific to the input." *Id.* at 57, Appx____.

Thus, the Coalition fails to establish that Commerce erred in rejecting a 12-digit HTS 7326.90.98.0019 broad basket category that potentially excludes the input, in favor of a 6-digit HTS 7326.90, that undisputedly includes the input. In other words, contrary to Coalition's arguments, Commerce's choice of a product-specific 6-digit code is preferable to a potentially non-specific 12-digit code.

Finally, the Coalition's arguments are undermined by agency

precedent. As Commerce found more than a decade ago:

> Petitioner has not explained why it views the Thai sources to be more specific, other than to state that the Thai data reaches to the eight- and eleven-digit HTS categories and that the Philippine data extends only to the six-digit categories. That an HTS category extends to eight- or eleven-digits does not, on its own, render the source more specific relative to a six-digit HTS category, given that the larger digit category may be overly-narrow relative to the input used by the respondent. In this case, the record demonstrates that the Thai data is not any more specific than the Philippine data in valuing the inputs used by the Shanghai Wells Group. The Shanghai Wells Group provided general descriptions about the physical characteristics of the FOPs under consideration. The Philippine HTS categories are specific to the inputs as reported by the Shanghai Wells Group. There is no indication that the eight and eleven-digit Thai HTS categories, which may be overly-narrow and not encompass the inputs used by the Shanghai Wells Group, are the more specific source.

*Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013), IDM Comment IC. Likewise, "the {Turkish 7326.90} HTS categories are specific to the inputs as reported by {Dingli and} there is no indication that the {12}-digit {Turkish} HTS {7326.90.98.0019}, which may be overly-narrow and not encompass the inputs used by the {Dingli}, are the more specific source." *Id*.

Therefore, this Court should reject the Coalition challenges to

22

Commerce's valuation of Dingli's steel forearm articles as unsupported by substantial evidence and agency precedent.

### C. Commerce Reasonably Selected HTS 8536.20 to Value Dingli's Circuit Breaker

The Coalition claims Commerce erred by "valu{ing} Dingli's circuit breaker input with subheading 8536.20, covering 'Automatic Circuit Breakers For A Voltage Not Exceeding 1,000 V.'" Pet. Br. at 36. It argues that Commerce should instead have used HTS 8536.20.10.0019, which excludes household circuit breakers, and covers non-household circuit breakers rated below 63 amps. *Id.* at 36-40. As explained below, Commerce's decision was reasonable and the Coalition fails to establish how its proposed choice results in a superior SV.

First, the Coalition fails to support its choice of HTS 8536.20.10.0019. The Coalition requests this subheading, which excludes household circuit breakers, by reasoning that Dingli's circuit breakers are not comparable to household circuit breakers (covered by another 12-digit HTS under 8536.20) since "{MAE} are neither houses nor household items." Pet. Br. at 39. This argument is misplaced because the fact that "a household and MAE operating on a battery are entirely different settings, . . .does not speak as to whether a

23

substantial difference in the functionality or performance of a circuit breaker necessarily exists." IDM at 68, Appx____. As such, by improperly focusing on the end use of the input instead of the design features of a circuit breaker, the Coalition fails to show that Dingli's circuit breakers are not comparable to household circuit breakers.

Second, the Coalition argues that "Commerce ignored the fact that Dingli reported its circuit breakers as being rated to 20 amps." Pet. Br. at 39. This argument is unpersuasive because even though HTS 8536.20.10.0019 covers 20 amps circuit breakers, it excludes household circuit breakers, which, absent evidence to the contrary, are reasonably comparable to Dingli's input. Id. at 67-68, Appx___-____. Consequently, Commerce reasonably concluded that the broader HTS 8536.20 best satisfied the best available information standard. Therefore, this Court should reject the Coalition arguments challenging Commerce's valuation of Dingli's circuit breaker.

## <u>CONCLUSION</u>

For the foregoing reasons, Dingli respectfully requests that this Court affirm those aspects of Commerce's *Final Results* challenged by the Coalition as being supported by substantial evidence and otherwise

24

in accordance with law.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

*599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**

1201 New York Ave., NW,
Suite 650
Washington, DC 20005

*Counsel for Defendant-Intervenor
Zhejiang Dingli Machinery Co.,
Ltd.*

Dated: April 23, 2026

# CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Defendant-Intervenors' Response Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 4,474 words, less than the 7,000 word limit.

*/s/ Jordan C. Kahn*
*Counsel for Defendant-Intervenor*
*Zhejiang Dingli Machinery Co.,*
*Ltd.*

Dated: April 23, 2026

15160958_3