# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant,<br><br>　　and<br><br>ZHEJIANG DINGLI MACHINERY CO., LTD.,<br><br>　　　　　Defendant-Intervenor. | Before: Hon. M. Miller Baker, Judge<br><br>Court No. 24-00219 |

## PLAINTIFF'S REPLY IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Manufacturers of Mobile Access Equipment*

Dated:  June 25, 2026

Ct. No. 24-00219                                    PUBLIC DOCUMENT

## TABLE OF CONTENTS

                                                                PAGE
I.    Introduction ............................................................................... 1

II.   Summary of the Arguments ............................................................ 1

III.  Argument ..................................................................................... 4

      A.    All 12-Digit Turkish HTS Codes Were on the
            Record and Should Have Been Relied on by
            Commerce ........................................................................... 5

      B.    The Bulgarian and Turkish Harmonized Tariff
            Systems Are, In Fact, Harmonized and
            Commerce Should Have Relied on the Turkish
            Data ................................................................................... 14

      C.    Specificity *Is* Superiority If Data Are Reliable,
            and Commerce Should Have Relied on
            Petitioner's Data ................................................................ 20

V.    Conclusion ................................................................................ 23

i

Ct. No. 24-00219

PUBLIC DOCUMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)..............................................................................................8

*Dorbest Ltd. v. United States*,
30 C.I.T. 1671, 462 F. Supp. 2d 1262 (2006).....................................................22

*Guangdong Chems. Imp. & Exp. Corp. v. United States*,
30 C.I.T. 1412, 460 F. Supp. 2d 1365 (2006).....................................................21

*Home Meridian International, Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014) .................................................................... 22-23

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*,
322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .....................................................17

*Jiaxing Bro. Fastener Co. v. United States*,
11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) .......................................................10

*Jiaxing Bro. Fastener Co., Ltd. v United States*, 822 F.3d 1289 (2016) .................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...............................................................................................18

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ..........................................................................10

*Securities and Exchange Commission v. Chenery Corp.*,
332 U.S. 194 (1947)...............................................................................................8

*Writing Instrument Mfrs. Ass'n, Pencil Section v. United States Dep't
of Commerce*,
21 C.I.T. 1185, 984 F. Supp. 629 (1997).................................................... 20-21

*Xiping Opeck Food Co. v. United States*,
551 F. Supp. 3d 1339 (Ct. Int'l Trade 2021) .............................................. 17-18

Ct. No. 24-00219                                    PUBLIC DOCUMENT

**Regulations**

19 C.F.R. § 351.408(c)(2) ................................................................................25

**Administrative Materials**

*Certain Mobile Access Equipment and Subassemblies Thereof From
   the People's Republic of China*,
   89 Fed. Reg. 88,730 (Dep't Commerce Nov. 8, 2024) .........................................5

*Certain Mobile Access Equipment and Subassemblies Thereof From
   the People's Republic of China*,
   89 Fed. Reg. 35,067 (Dep't Commerce May 1, 2024) ......................................22

**PUBLIC DOCUMENT**

# <u>GLOSSARY</u>

**Commerce**
U.S. Department of Commerce
**Defendant**
The United States
**Dingli**
Defendant-Intervenor Zhejiang Dingli Machinery Co., Ltd.
**HS**
Harmonized Schedule
**HTS**
Harmonized Tariff Schedule
**TARIC**
Integrated Tariff of the European Union
**Plaintiff or Petitioner**
Coalition of American Manufacturers of Mobile Access Equipment

## I.    INTRODUCTION

On behalf of Plaintiff, the Coalition of American Manufacturers of Mobile Access Equipment ("Plaintiff" or "Petitioner"), we respectfully submit the following reply to the response briefs of Defendant the United States ("Defendant") and Defendant-Intervenor Zhejiang Dingli Machinery Co., Ltd.'s ("Dingli"). *See* Def.'s Resp. to Consol. Pl.'s Rule 56.2 Mots. for J. on the Agency Record (Mar. 4, 2026), ECF No. 41 ("Def. Br."); Def.-Int. Dingli's Resp. to Pl.'s Mot. for J. on the Agency Record Pursuant to USCIT Rule 56.2 (Apr. 23, 2026), ECF No. 44 ("Def.-Int. Br.").

## II.    SUMMARY OF THE ARGUMENTS

The U.S. Department of Commerce ("Commerce") erred in relying on the surrogate value data provided by Dingli, instead of data provided by Petitioner, to value certain of Dingli's inputs. In its opening brief, Plaintiff argued that Commerce unlawfully valued six of Dingli's inputs. *See generally* Pl.'s Rule 56.2 Mot. for J. on the Agency Record (Aug. 11, 2025), ECF No. 34 ("Pl. Br."). The Court should instruct Commerce to reconsider its valuation of these six inputs in a remand determination.

In its response brief, Defendant wrongly argues that Commerce's determinations as to the inputs in question were supported by substantial

evidence and consistent with law. Def. Br. at 36-55. In doing so, Defendant makes three overarching arguments, which it reiterates through its discussion of the inputs on appeal. None of these arguments have merit.

*First*, Defendant incorrectly argues that where Petitioner placed 12-digit Turkish Harmonized Tariff Schedule ("HTS") data on the record that it failed to demonstrate that these were the only 12-digit codes corresponding to the relevant 8-digit categories. Defendant's position is both wrong as a factual matter and demonstrably beyond Commerce's stated reasoning. Defendant offers an impermissible *post hoc* rationalization of Commerce's final analysis, where the agency merely stated that there was "no record evidence" to support Petitioner's position and otherwise failed to address the unrefuted evidence Petitioner had submitted. Def. Br. at 43. Similarly, Defendant improperly speculates that there *could* be other 12-digit subheadings that are simply not on the record, but such conjecture is not supported by the record. Further, Defendant's attempt to justify Commerce's *post hoc* analysis is inconsistent with Commerce's antidumping duty regulations and established practice when relying on data from its primary surrogate country.

*Second,* Defendant also wrongly asserts that certain 12-digit Turkish HTS code definitions provided by Petitioner were not identical to the Bulgarian data on the record up through the 8-digit level. Defendant's argument is not persuasive. Commerce failed to adequately explain its finding that the Bulgarian and Turkish 8-digit HTS definitions were not the same and why any observed differences warranted relying on data from outside its primary surrogate country. Further, Commerce's decision to rely on the Bulgarian data is wholly at odds with unrebutted record evidence and widespread recognition that the Bulgarian and Turkish subheadings in question are definitionally identical. Commerce also failed to make its surrogate value data selection within its established framework for choosing data from its primary surrogate country.

*Third,* Defendant mistakenly argues that Commerce reasonably declined to use Petitioner's preferred Turkish data because a more specific HTS code is not necessarily superior to other potential surrogate value data sources. While that may be true in some cases, it is not the case here. Further, the cases cited by Defendant show why that principle does not apply in this instance, as the rejected data in the cited cases were categorically flawed such that they were found to be entirely unreliable.

**PUBLIC DOCUMENT**

## III.  ARGUMENT

Commerce erred in selecting the surrogate value data provided by Dingli to value certain of Dingli's inputs. For these and other inputs, Petitioner provided Commerce with surrogate value data from the agency's selected primary surrogate country that were equally or more specific to the inputs in question than the data provided by Dingli. Commerce's reasons for nevertheless rejecting Petitioner's data and relying on Dingli's data were unsupported by substantial record evidence, unreasonable, and/or inadequately explained. Accordingly, as detailed in Plaintiff's opening brief, Commerce's selection of certain surrogate value data should be remanded for reconsideration by the agency.

The arguments raised by Defendant in its response brief are unavailing and do not justify the unsupported, unreasonable, and unexplained surrogate value determinations made by Commerce in the Final Results. In its brief, Defendant presents three overarching arguments, which it repeats in its discussions of the multiple inputs at issue on appeal. Those three arguments are addressed in turn below.

### A.    All 12-Digit Turkish HTS Codes Were on the Record and Should Have Been Relied on by Commerce

Defendant wrongly argues that Petitioner failed to demonstrate that the Turkish data it provided at the 12-digit HTS level for motor controllers, hot-rolled and cold-rolled steel tubes, and rectangular steel tube were the only 12-digit HTS codes applicable to the relevant 8-digit HTS categories for these inputs.[1] *See* Def. Br. at 38-39. In the Final Results, for these surrogate values, Commerce relied on data for 8-digit Bulgarian HTS codes instead of the 12-digit Turkish HTS codes identified by Petitioner, reasoning that there is "no record evidence" that the 12-digit data provided by Petitioner reflected the only 12-digit subheadings available under the relevant 8-digit categories. *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 88,730 (Dep't Commerce Nov. 8, 2024) (final results of antidumping

---

[1]    Plaintiff notes that Defendant's argument on this issue is raised most directly regarding valuation of Dingli's motor controllers, hot-rolled and cold-rolled steel tubes, and rectangular steel tubes. Def. Br. at 36-47. However, Defendant appears to implicate similar claims in its arguments related to valuing brakes, steel forearm articles, and circuit breakers. *See id.* at 48-55. As addressed in Plaintiff's opening brief and discussed further below, for many of the same reasons, complete 12-digit Turkish data were available on the record and should have been relied on to value those inputs as well. *See* Pl. Br. at 29-40.

duty admin. rev.; 2022-2023), P.R. 298, Appx___ ("Final Results") and accompanying Issues and Decision Memorandum at 46-53, P.R. 294, Appx___ ("I&D Memo"). As Plaintiff showed in its opening brief, these findings were incorrect and contrary to the weight of the record evidence, as Commerce had the full universe of available Turkish codes on the record. Pl. Br. at 16-18, 24-25, 27-28.

Defendant asserts in its response brief that Petitioner's affirmation that all relevant 12-digit HTS codes were on the record was not sufficient, noting that Petitioner "could have provided relevant excerpts from the Turkish tariff schedule containing the entire 12-digit HS breakouts under the six-digit HS but failed to do so." Def. Br. at 39. Defendant's argument is unlawful and factually incorrect on several grounds.

*First,* Defendant's claim constitutes an impermissible *post hoc* rationalization of Commerce's analysis in the Final Results. In declining to rely on Petitioner's 12-digit Turkish data in its final analysis, Commerce repeatedly stated that it was choosing to do so because there was "no record evidence" that all 12-digit codes were on record. I&D Memo at 46-53. The government is now changing its tune. In its brief, Defendant argues for the first time not that there was "no record evidence" but rather that the

evidence provided by Petitioner was insufficient to support its claim that all 12-digit HTS codes were on the record. Def. Br. at 38-39. That is a subtle but important difference.

Commerce never claimed or explained in the underlying administrative review that it was relying on 8-digit Bulgarian data instead of 12-digit Turkish data because it did not find Petitioner's evidence to be sufficient to show that the 12-digit codes were the only relevant categories for each 8-digit subheading. *See* I&D Memo at 46-53. Rather, Commerce simply and repeatedly stated that there is "no record evidence" that the 8-digit categories contained only the 12-digit Turkish subheadings for which there was data on the record. *Id.* at 49, 50, and 53. In fact, Commerce's analysis failed to acknowledge (let alone consider and address) Petitioner's representation that it had provided all relevant HTS codes and its explanation as to why that conclusion could be readily confirmed by the information on the record. *See id.* at 46-53.

To illustrate, Plaintiff demonstrated in its brief that the Turkish import data on the record confirm that every 12-digit HTS subheading ending in "0000" was the only 12-digit breakout under that that 8-digit HTS subheading. Pl. Br. at 17 n.3. In other words, not only is there record

7

evidence, but this evidence clearly supports Petitioner's argument. Indeed, Defendant concedes this possibility in its brief, agreeing with Plaintiff that Petitioner "believe{s} they have included all HS subheadings at the six-digit and 12-digit level comprising the six-digit heading." Def. Br. at 38-39. Still, Defendant side-steps the fact that Commerce never considered this evidence in the Final Results.

As such, Defendant's argument amounts to an impermissible *post hoc* rationalization of Commerce's Final Results, as established in cases such as *Burlington* and *Chenery*. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself{.}"); *Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("{A} reviewing court . . . must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.")

8

Here, the "basis articulated in the order by the agency" was that there was "no record evidence" that all 12-digit HTS codes were on the record. As shown above, that is demonstrably wrong. There is evidence on the record, but Commerce simply failed to consider it. Thus, Commerce's determination is necessarily unsupported by substantial evidence.

*Second*, Defendant's supposition that there *could* be other 12-digit HTS subheadings that are not identified on the record is entirely unsupported by the evidence that is on the record and amounts to procedurally improper speculation. As illustrated above, the evidence before Commerce showed that every 12-digit HTS code ending in "0000" was the only 12-digit subheading for the corresponding 8-digit parent category. Pl. Br. at 17 n.3. Further, Petitioner expressly represented to Commerce that it had placed on the record Turkish import data for all HTS subheadings at the 12-digit level that correspond to the 6-digit level data provided by Dingli. *Id.* at 17. There is *no* record evidence suggesting that Petitioner's assertions are wrong.

Yet, Defendant speculates that there could be other 12-digit HTS codes for these 8-digit subheadings that are simply not on the record. Def. Br. at 38-39. Defendant's conjecture is not based on any record evidence but

**PUBLIC DOCUMENT**

rather constitutes speculation about what the record could be. *See id.* As Defendant outlines in its own brief, Commerce may not speculate on factual issues not established by record evidence. *Id.* at 48. The courts are clear that "'mere speculation' is not substantial evidence" when it comes to evaluating surrogate values. *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019). Accordingly, Defendant's *post hoc* explanation for Commerce's determination is unsupported by substantial evidence.

*Third*, apart from being improper in the abstract, Commerce's choice to ignore record evidence and Defendant's attempt to justify that analysis after the fact with unfounded speculation are inconsistent with Commerce's governing regulations and practice. Commerce's antidumping duty regulations state that the agency "normally will value all factors in a single country." 19 C.F.R. § 351.408(c)(2). Further, as Defendant explains in its brief, Commerce will "*only resort* to a second surrogate country if data from the primary surrogate country are *unavailable or unreliable.*" Def. Br. at 23 (citing *Jiaxing Bro. Fastener Co. v. United States*, 11

10

F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014) (citations omitted) (emphasis added), *aff'd*, *Jiaxing Bro. Fastener Co., Ltd. v United States*, 822 F.3d 1289 (2016)).

That is, for Commerce to turn to Bulgarian data in lieu of Turkish data to value these inputs, the agency was required to find that the relevant Turkish data were unavailable or unreliable. It did neither here. Commerce failed to adequately explain why the *possibility* of other 12-digit HTS codes rendered the Turkish data unavailable or unreliable. I&D Memo at 46-53. Likewise, by ignoring the record evidence that these Turkish data were in fact available and reliable, the agency failed to sufficiently explain its determination. *Id.* Consequently, Commerce had no legal basis for rejecting available and reliable data from its primary surrogate country (*i.e.*, Turkey) and relying instead on data from a secondary surrogate country (*i.e.*, Bulgaria).

At bottom, Petitioner demonstrated during the underlying review that data for all 12-digit Turkish HTS codes corresponding with the relevant 8-digit HTS categories were on the record such that Commerce had no grounds for turning away from Turkish data. Pl. Br. at 17. Subject to criminal penalties, Petitioner specifically affirmed that the data on the

11

record was complete based on its knowledge of the Turkish HTS codes. *Id.* And Petitioner showed through an analysis of the import data on the record that that every 12-digit HTS code ending in "0000" was the only 12-digit subheading for the corresponding 8-digit parent category. *Id.* at 17 n. 3. No evidence refutes these statements.

Commerce cannot just ignore record evidence, including a party's affirmation of the factual nature and context of that evidence. This is especially so when—as is the case here—there is no record evidence to the contrary, and the party's affirmation is consistent with common sense and the record as a whole. Defendant's *post hoc* argument that Petitioner could have done more to make its point is barred under *Barrington* and *Chenery* and, in any event, still contrary to the weight of record evidence. Accordingly, the Court should reject Defendant's arguments and find that Commerce erred by relying on 8-digit Bulgarian data to value motor controllers, hot-rolled and cold-rolled steel tubes, and rectangular steel tube inputs instead of 12-digit Turkish data.

As a final matter, Dingli separately and wrongly argues that Petitioner's statements that all 12-digit Turkish HTS codes were on the record was untimely submitted. Def.-Int. Br. at 5. This line of argument is

12

both waived and meritless. Dingli never raised this argument in the underlying review and, thus, it is waived from making it now as an affirmative defense. *See generally* I&D Memo; Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Dingli's Revised Case Brief in the First Administrative Review of Antidumping Duty Order on Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)* (June 20, 2024), P.R. 280, C.R. 242-43, Appx___; Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP to Sec'y Commerce, re: *Dingli's Rebuttal Brief in the First Administrative Review of Antidumping Duty Order on Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)* (June 17, 2024), P.R. 274, C.R. 238-39, Appx____. Indeed, Dingli never argued below that Commerce should reject this analysis, let alone that Petitioner's entire argument constituted untimely factual information.

Moreover, the statements that Dingli points too are by no means new factual information but rather analysis of information already on the record. *See* Def.-Int. Br. at 5. Further, Commerce did not find that the analysis and statements made by Petitioner were untimely submitted. *See*

13

*generally* I&D Memo. Therefore, they remain on the record as evidence in support of Petitioner's claims. As such, there is no basis for Commerce to ignore that information.

### B.    The Bulgarian and Turkish Harmonized Tariff Systems Are, In Fact, Harmonized and Commerce Should Have Relied on the Turkish Data

Defendant also incorrectly argues that certain 12-digit Turkish HTS code definitions provided by Petitioner were not identical to the Bulgarian data on the record up through the 8-digit level. Def. Br. at 40. In the Final Results, when valuing Dingli's motor controller inputs, Commerce relied on data for 8-digit Bulgarian HTS codes instead of the 12-digit Turkish HTS codes identified by Petitioner in part because the agency found that the descriptions of the Bulgarian and Turkish HTS code differed at the 8-digit level. I&D Memo at 49. As Plaintiff demonstrated in its opening brief, Commerce's conclusion was insufficiently explained, against the weight of the record evidence, and inconsistent with established precedent and common understandings of harmonized tariff systems. Pl. Br. at 18-22.

Defendant asserts in its response brief simply that the 8-digit Bulgarian and Turkish HTS code descriptions are not the same and thus it was

14

reasonable for Commerce to rely on the Bulgarian data to value Dingli's motor controllers. Def. Br. at 40. However, this abrupt conclusion belies the fact that countries' harmonized tariff systems are, by definition, identical to the 6- or 8-digit level. *See* Pl. Br. at 18-22. For the reasons below, Defendant's argument fails on several fronts.

*First,* Commerce failed to adequately explain its finding that the Bulgarian and Turkish 8-digit HTS definitions were not the same and why any observed differences warranted relying on data from outside its primary surrogate country. In the Final Results, Commerce devoted less than a sentence to this issue, merely pointing out that "the differing descriptions for competing HS categories challenge the petitioner's claim that the product coverage under Turkish HS subheading 8538.90.91.0000 is identical to that under Bulgarian HS 8538.90.91." I&D Memo at 49. That was the full extent of Commerce's analysis, which is plainly not a sufficient, let alone reasonable, explanation.

As Plaintiff has described, Bulgaria and Turkey both use a harmonized tariff nomenclature, the Integrated Tariff of the European Communities, which is commonly referred to as the "TARIC" system. Pl. Br. at

18-19. The first six digits of a TARIC subheading are the 6-digit Harmonized Schedule ("HS") code, the next two digits (*i.e.*, to the 8-digit level) are the combined international nomenclature, and the last two digits (*i.e.*, to the 10-digit level) are the TARIC nomenclatures. *Id.* at 19. In effect, this means that the Turkish customs nomenclature is identical to Bulgaria's down to at least the 8-digit level (and likely to the 10-digit level). Given their language differences, Bulgaria and Turkey, may *translate* subheadings differently, just like any other two countries using a common nomenclature. That does not alter the fact that the tariff *codes* are meant to be identical and cover the same merchandise.

The government fails entirely to grapple with the fact that Bulgarian and Turkish definitions are substantively identical through at least the 8-digit level. In the Final Results, Commerce ignores the issue entirely, identifying only the "differing descriptions." I&D Memo at 49. Likewise, Defendant does not even try to respond to Plaintiff's arguments, stating simply that "the proposed descriptions are not identical and the Coalition's claims to the contrary lack merit." Def. Br. at 40. In sum, Commerce fails to adequately explain its determination, and Defendant fails to provide any coherent response to Plaintiff's argument otherwise.

*Second*, Commerce's decision to rely on the Bulgarian data instead of the Turkish data is wholly at odds with unrebutted record evidence and widespread recognition that the TARIC system subheadings in question are definitionally identical. As reiterated above, the record clearly shows that Bulgarian and Turkish customs definitions are identical to at least the 8-digit level due to their shared use of the TARIC system. Pl. Br. at 19. This is not refuted anywhere on the record, nor does Defendant or Commerce attempt to argue as much.

Moreover, this understanding of the TARIC system and other similar harmonized tariff systems has been consistently recognized by this Court. For example, in *Jiangsu Senmao*, the Court explained that individual countries' HTS subheadings are "internationally harmonized" and definitionally identical to at least the 6-digit level. *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F. Supp. 3d 1308, 1320 (Ct. Int'l Trade 2018). Similarly, in *Xiping Opeck Food*, the Court explained that TARIC is a customs classification system akin to the U.S. HTS, which is "organized in a hierarchical structure by sections, chapters, heading, and subheading, and is based upon the international Harmonized Commodity Descriptions and Coding System administered by the

17

World Customs Organization," where "each product is assigned its own TARIC number." *Xiping Opeck Food Co. v. United States*, 551 F. Supp. 3d 1339, 1342-43 (Ct. Int'l Trade 2021). To emphasize, under the TARIC system, like any other harmonized tariff system, when two tariff categories have the same subheading number to a certain level (*e.g.*, 8538.90.91), they are meant to be identical.

Furthermore, Commerce's failure to acknowledge unrebutted evidence that the Bulgarian and Turkish tariff schedules are presumptively (and in fact) harmonized to at least the 8-digit level is a failure to address a very important aspect of the issue in question. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem."). As a result, Commerce's analysis is incomplete and not supported by the record.

*Third*, Commerce failed to make its surrogate value data selection for motor controllers in the context of its established framework of choosing data from its primary surrogate country. As detailed above, Commerce maintains a strong preference for relying on surrogate value data from a

single country, and it only deviates from its primary surrogate country where data is unavailable or unreliable. *See* Def. Br. at 23.

Accordingly, even if Commerce was able to reasonably determine that the 12-digit level Turkish data were not the best information available, given that the Turkish and Bulgarian HTS codes are harmonized, there is a definitionally equivalent Turkish code to the Bulgarian code that Commerce picked. Thus, because Commerce has not shown that the Turkish data are unavailable or unreliable, consistent with Commerce's antidumping duty regulations and established practice, the agency was required to rely on the 12-digit Turkish HTS code.

In short, Commerce blatantly ignored the fundamental fact that the Bulgarian and Turkish harmonized tariff systems are identical to at least the 8-digit level. This fact is unrefuted on the record and is consistent with established understandings of how TARIC and other international harmonized tariff systems function. Therefore, Commerce should have relied on the 12-digit Turkish HTS data to value Dingli's motor controller inputs, especially given Commerce's selection of Turkey as the primary surrogate country. Commerce failed to adequately explain its decision to

19

do otherwise in the Final Results, and Defendant offers no compelling argument to rebut Plaintiff's claims.

### C.    Specificity *Is* Superiority If Data Are Reliable, and Commerce Should Have Relied on Petitioner's Data

In the Final Results, Commerce found that the record did not support that several of the 12-digit Turkish HTS codes provided by Petitioner were necessarily more probative than other, less specific data. *See, e.g.*, I&D Memo at 48-57. On that issue, throughout its response brief, Defendant argues that Commerce reasonably declined to use Petitioner's preferred Turkish data because numerical specificity in HTS codes does not necessarily constitute superiority between competing surrogate values. *See* Def. Br. at 43-51. While that can be true, the case law repeatedly cited by Defendant illustrates perfectly why that principle does not apply in this case. Indeed, in each of these cases, the rejected data was specific but categorically flawed to the point of being unreliable.

*First*, in *Writing Instrument Mfrs.*, this Court affirmed Commerce's determination to rely on a broader tariff category where the data in the narrower (*i.e.*, more specific) category were "aberrational by any measure." *Writing Instrument Mfrs. Ass'n, Pencil Section v. United States*

*Dep't of Commerce¸* 21 C.I.T. 1185, 1195, 984 F. Supp. 629, 639-40 (1997) (internal quotation marks omitted). Commerce has made no such finding here, nor has Defendant argued that the Turkish data in question are aberrational. As such, *Writing Instrument Mfrs.* is not relevant to the present case and Defendant's repeated references to it are misplaced.

*Second*, in *Guangdong Chems*, the Court affirmed Commerce's determination to rely on a less specific tariff category where the narrower value "included only two data points" and "it was unclear how the data {in that set} were selected." *Guangdong Chems. Imp. & Exp. Corp. v. United States*, 30 C.I.T. 1412, 1419-1420, 460 F. Supp. 2d 1365, 1370–71 (2006). The Court also noted that "Commerce found no information on the record showing why certain imports were included, while other imports were not," and "{w}ithout information on how transactions were chosen for inclusion in the {} data, Commerce could not be certain that the method used to select imports in the {} data was not biased." *Id.* Here, there are not similar questions or concerns about Petitioner's proffered Turkish data. In fact, the Bulgarian and Turkish data on the record come from similar sources (*i.e.*, Trade Data Monitor and Global Trade Atlas, respectively) and are generally comparable in quality. *See Certain Mobile*

21

*Access Equipment and Subassemblies Thereof From the People's Republic of China*, 89 Fed. Reg. 35,067 (Dep't Commerce May 1, 2024) (prelim. results and partial rescission of antidumping duty admin. rev.; 2022-2023), P.R. 257, Appx___ and accompanying Preliminary Decision Memorandum at 10, P.R. 249, Appx___.

*Third*, in *Dorbest*, the Court affirmed Commerce's reliance on an over-inclusive data set where the data in question was just "a single product list from a single producer" and reflected "the wrong level of trade to use for surrogate valuation." *Dorbest Ltd. v. United States*, 30 C.I.T. 1671, 1701-1702, 462 F. Supp. 2d 1262, 1289-90 (2006). Neither of those concerns are present in the current case, nor has the government any similar issues with the applicability of Petitioner's Turkish data.

*Fourth*, as Defendant acknowledged in its brief, in *Home Meridian International, Inc. v. United States*, the U.S. Court of Appeals for the Federal Circuit has "recogniz{ed} that broader surrogate categories may be preferable *where they provide greater reliability or better reflect market conditions*." Def.'s Br. at 42 (citing *Home Meridian International, Inc. v. United States*, 772 F.3d 1289, 1295 (Fed. Cir. 2014)). However, the focus of the analysis in *Home Meridian* related to the relative contemporaneity

22

**PUBLIC DOCUMENT**

of data sources and whether the inputs used to produce subject merchandise were market economy purchases. *See Home Meridian*, 772 F.3d at 1295-96. Similar questions are not relevant here, nor have they been raised by Defendant or Commerce.

In sum, Plaintiff agrees, consistent with the cases cited by Defendant, that where specific surrogate value data are found to be aberrational or unreliable that they may not be the best information available for the purpose of valuing inputs. However, these cases do stand for a broader principle that Commerce may avoid data specificity and turn away from more specific data sources for any reason. In this regard, Defendant's repeated reference to these four cases throughout its brief completely misses the mark and does not excuse Commerce's reliance on overbroad data in this case. *See* Def.'s Br. at 41, 44, 46-48.

## V.   CONCLUSION

For the foregoing reasons, and those in Plaintiff's opening brief, the Court should remand the final determination in the underlying administrative review to Commerce consistent with Plaintiff's briefs.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Enbar Toledano, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Coalition of American*
*Manufacturers of Mobile Access Equip-*
*ment*

Dated:  June 25, 2026

Ct. No. 24-00219

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Defendant-Intervenor's Response to Plaintiff's Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2026), is 4,538 words.

The undersigned also certifies that this submission was not prepared with the assistance of a generative acritical intelligence program based on natural language prompts—such as, but not limited to, ChatGPT or Google Bard.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

*Coalition of American Manufacturers*
*of Mobile Access Equipment*
(Representative Of)

June 25, 2026
(Date)